# GEORGE W. KONIG

## *vs.*

# THE MAYOR AND CITY COUNCIL OF BALTIMORE

### ET AL.

*City of Baltimore*: *contracts; alternative proposals and bids;*
*power and duty of Board of Estimates. Injunction*:
*acts committed after—; mandamus to restore.*

Under the provisions of the Charter of Baltimore City, in
contracts to be awarded by the Board of Awards, there may be
competition between different *things,* as well as between prices
bid respectively upon each of these different things; but the
thing or things for which the City invites proposals, must be
determined in advance of the advertisement for bids, and there
can be no departure in the proposals from the specifications in
regard to those things; and where the advertisement calls for
bids on two or more things,—once the proposals are received
and opened, the award must be made to the lowest responsible
bidder for one particular *thing,* without reservation of any dis-
cretion to be exercised by the municipal authorities as to an
essential to the contract.                                    p. 623

Equity will not permit a wrongdoer to shield himself behind
a suddenly or secretly changed status; although he succeeded in
making the change before the hand of the chancellor actually
reached him.                                                  p. 627

Where before the granting of an injunction, the defendant
has changed the condition of things, the Court may not only
restrain further action by him, but may compel him to restore
the subject-matter of the suit to its former condition.      p. 627

*Decided June 24th, 1915.*

Appeal from Circuit Court No. 2 of Baltimore City.
(HEUISLER, J.)

The cause was argued before BOYD, C. J., BURKE, THOMAS,
PATTISON, URNER, STOCKBRIDGE and CONSTABLE, JJ.

*Edgar Allan Poe* and *Morris M. Townley* (with whom were *Osborne I. Yellott, William Curran* and *Bartlett, Poe, Claggett & Bland* on the brief), for the appellant.

*S. S. Field, the City Solicitor,* and *Alexander Preston, Deputy City Solicitor,* for the appellees.

THOMAS, J., delivered the opinion of the Court.

This appeal is from a decree of Circuit Court No. 2 of Baltimore City dismissing the bill of complaint filed by the appellant, on his own behalf and on behalf of other taxpayers of Baltimore City, against the Mayor and City Council of Baltimore, the American Water Softener Company and others to have a contract between said company and the city annulled and the defendants enjoined from doing anything in furtherance or execution of the same.

The Mayor and City Council of Baltimore, acting under authority conferred upon it by an Act of the Legislature, was engaged in erecting a filtration plant for the city, and having adopted plans and specifications for a "Filter Equipment," the Board of Awards advertised for bids for the work as follows:

> "Sealed proposals, endorsed 'Bids for Filter Equipment, Lake Montebello, Water Department, Contract No. 22,' addressed to the Board of Awards of Baltimore City, will be received at the office of the City Register, City Hall, Baltimore, Md., until 11 A. M. Wednesday, February 18th, 1914, for the equipment of the Filtration Plant, as shown on plans on file in the office of the Water Engineer, City Hall, Baltimore, Md.

> "Plans and specifications can be obtained at the office of the Water Engineer, City Hall, Baltimore, Md., on and after February 2nd, 1914. A charge of Twenty Dollars ($20.00) will be made for each set of plans and specifications; this amount will be refunded upon the return of these plans and specifications before Feb-

ruary 25th, 1914, in good condition. Specifications used in making a bid will be considered as returned.

"A certified check of the bidder on a clearing-house bank, made payable to the Mayor and City Council of Baltimore for the sum of Ten Thousand Dollars ($10,000) will be required with each bid.

"The successful bidder will be required to give bond to comply with the City Charter respecting contracts.

"The Board of Awards reserves the right to reject any or all bids."

The specifications provided that the bids should be made upon the blank forms thereto attached, and that the bidder should give the price of each item of the proposed work in writing and in figures. The sixth paragraph required the successful bidder to give bond in the amount of the contract for his faithful compliance with the contract and specifications, and to indemnify and save harmless the Mayor and City Council of Baltimore from all costs, damages, etc., and "to save and keep harmless the said Mayor and City Council of Baltimore against and from all claims and losses to it from any cause whatever, including patent infringements." Paragraph nine required the bidder to submit with his proposal a statement regarding his experience and business standing, and stated that it was the purpose of the Board of Awards not to award the contract to any bidder who did not furnish reasonable and satisfactory evidence of his ability and experience, etc. Paragraphs ten and eleven were as follows:

"Bids for Alternative Items—(10) Bidders must submit bids on both of the alternative Items, 1-A and 1-B. The Board of Awards reserves the right to accept either one of the alternative Items in connection with the other items of this contract.

"Statement of Quantities—(11) The following is a statement of the work required under this contract, and the items given below will be used as a basis in comparing the several bids, viz:

Item 1-A—For Strainer System (Alternative item.)

Item 1-B—For Strainer System (Alternative Item).

Item    2—For 32 Filter Rate Controllers.

Item    3—For laying 300 tons of Bell and Spigot Pipe.

Item    4—For laying 145 tons of Bell and Spigot Specials and Valves.

Item    5—For laying 360 tons of Flange Specials and Valves.

Item    6—For 7,500 pounds of Steel and Iron Pipe Hangers and Supports.

Item    7—For 10 cubic yards of Concrete or Brick Pipe Supports.

Item    8—For Small Piping and Valves.

Item    9—For Wash Water Recording Gages.

Item 10—For Wash Water Level Gage.

Item 11—For Chemical Recording and Sight Gages.

Item 12—For High and Low Water Alarm.

Item 13—For Chemical Feed Controllers.

Item 14—For Chemical Stirring Devices.

Item 15—For Hypochlorite Device.

Item 16—For 3,424 cubic yards of Filter Sand.

Item 17—For 1,931 cubic yards Filter Gravel."

Paragraph 66 contained the following provisions:

"The City will pay, and the Contractor will accept, the prices stipulated in the proposal hereto attached, as full compensation for furnishing all materials, and for doing all the work contemplated and specified in this contract, * * * . Said prices shall also cover all royalties for patents, and patented material, appliances and processes used in the work described in the specifications and agreements."

Paragraph 77 provided that the contractor should be responsible for any claims made against the city or any of its agents for any infringement of patents by the use of patented methods, etc., and Paragraphs 78-79 and 80 were as follows:

*"Filter Equipment.*

"Alternative Items—Extent—(78) Either one of the two types of strainer systems designated hereafter, may be accepted for use in the construction of the plant at the option of the Board of Awards. A complete strainer system for 32 different filter units shall be furnished and placed under this contract. Each filter unit is divided into two halves each measuring 13 ft. 6 in. by 53 ft. 6 in. inside. It is the intention *to pass wash water through each of the above types of strainer systems at the rate of about 15 gallons per minute per square foot of sand area.*

"Item 1-A—(79) Item 1-A is shown upon drawing 67-A-3. With this type, water channels are formed by the spaces separating flat concrete ridge blocks, and the strainer system is formed by covering the spaces with continuous semi-elliptical perforated brass plates. The strainer plates are supported, in crossing the main water channel, on cast-iron plates. With this strainer system it is possible to use 'Negative Head' in filtration. That is to say, the operating head would be the head in the filter tank, plus such suction as might be created by lowering the water level in the filtered water reservoirs.

"Item 1-B—(80) Item 1-B is shown upon drawings 67-A-3 and 161-A-4. This type is the same as Item 1-A except that in each filter strainer system, two of the cast-iron bridge plates have been modified in form and vented in such a way that only the head due to the depth of water above the strainer plates is used in filtration, as specified in Paragraph No. 84."

It was alleged in the bill and admitted by the Water Engineer of the City that the construction provided for under Item 1-A referred to in paragraphs 11 and 79 involved the use of the process called "Negative Head," and the Engineer further stated that Item 1-B was designed by him with the view of avoiding the "Negative Head" process, that the cost of the two systems, aside from the cost "of any patent license,

would be practically the same," except that Item 1-B would involve the additional cost of putting on some pipes.   It was also alleged in the bill and evidence was offered tending to show that the process called "Negative Head" was a patented process, the patent for which belonged to the New York Continental Jewell Filtration Company, and that the Norwood Engineering Company and the Pittsburg Filter Manufacturing Company were licensed to use that process.

The City received the following bids for the work referred to:

|                                  | Item 1-A.    | Item 1-B.    |
| -------------------------------- | ------------ | ------------ |
| M. L. Bayard                     | $323,071.75  | $150,071.75  |
| American Water Softener Co.      | 156,832.85   | 156,832.85   |
| Norwood Engineering Co.          | 222,854.38   | 223,752.38   |
| Pittsburg Filter Mfg. Co.        | 238,591.00   | 239,591.00   |

With its bid the American Water Softener Company submitted the following communication:

"American Water Softener Company.

Philadelphia, Pa., February 25th, 1914.

To the Honorable Board of Awards,

Baltimore, Md.

Gentlemen:—

This communication is submitted with our bid for contract No. 22 and made a part thereof as fully as though incorporated therein in detail.

Our bid is submitted under the condition that, should the contract be awarded to us, and should the United States Letters Patent No. 644,137 be sustained in the appeal taken by the City of Harrisburg in the case of the New York Continental Jewell Filtration Company vs. the City of Harrisburg, Pa., and should an injunction to restrain the City of Baltimore and ourselves from constructing and equipping the Baltimore filters as per the plans and specifications prepared by the City be applied for and granted, then the filters shall be equipped and operated with the 'device for venting filter effluents,' as shown on the City's

drawing No. 161-A-4, and at the price named in our bid for Item No. 1-B, until the expiration of said Letters Patent and at which time we shall remove the vent pipes, free of charge, if the City should desire us to do so.

> Respectfully,
> American Water Softener Company,
> By Geo. F. Hodkinson (Signed),
> Manager Filter Department."

The bids were opened by the Board of Awards and referred to the Water Engineer, and at a meeting of the Board on the 6th of March, 1914, the Water Engineer submitted and read the following recommendation:

> "City of Baltimore, Municipal Department,
> March 6, 1914.

Water Department,
  Ezra B. Whitman,
    Water Engineer,
      C. L. Rector, Secretary.

To the Honorable Board of Awards:

Gentlemen—I beg to herewith submit full report and tabulation of bids upon the contract for the filtration equipment referred to the Water Board at the meeting of February 25th. You will see from the tabulation that the lowest bidder on Alternative 1-B is M. L. Bayard, his bid totalling $150,071.75.

The next lowest bidder is the American Water Softener Company, their bid totalling $156,832.85. The other two bids on 1-B total as follows: Norwood Engineering Company, $223,752.38; Pittsburg Filter Manufacturing Co., $239,591.00. The American Water Softener Company are well-known builders of filtration plants. According to my information, they have built about seventy-five plants throughout the country, many of which included equipment similar to our own and operated in a similar manner. Some of these plants they have designed themselves as well as built. They are perfectly familiar with all the threats that

are now being made by certain parties claiming to have patents and that such patents are being infringed; they have been through all this experience a number of times heretofore. In addition to this, they have offered to build the plant according to either Alternative 1-A or 1-B at the same figure, with a proviso that if it should be established by a court of last resort that Alternative 1-A infringes any patent and an injunction to prevent infringement should be granted, then they should be at liberty to change their construction to Alternative 1-B without additional cost to the City; whereas the bid of Bayard upon Alternative 1-A is so high as to be prohibitive.

In addition to this, M. L. Bayard & Company upon their letterhead which I have are described as 'Manufacturers Steam Engine Governors, Hindley Steering Gears, Water Works and Filtration Plant Equipment, Light Machinery, Special Tools and Appliances,' thus indicating that their experience has been rather as manufacturers of machinery, including filtration machinery, than as actual contractors for the construction of filtration plants.

We have been referred by Mr. Bayard to three filtration plants built in Philadelphia upon which he worked as sub-contractor. We have been referred to no case where he was the original contractor in a filtration contract similar to the present.

Mr. Bayard is very highly spoken of by the people to whom we have written in connection with his work as sub-contractor; but in view of the facts that the American Water Softener Company has had very much wider experience, and are very widely and favorably known as designers and contractors for the construction of filter plants, and are regularly engaged in the water purification business and that alone, and of their making the same bid Alternative 1-A and 1-B, it is my judgment that they should be considered the lowest responsible bidder under these specifications, and the contract should be awarded them, the Board of Awards reserving the right to require the con-

struction of the contract under the direction of the
Water Engineer in accordance with either Item 1-A
or 1-B as may be directed.

Respectfully submitted,

Ezra B. Whitman,
Water Engineer."

The Board of Awards, after hearing counsel for the other
bidders, awarded the contract to the American Water Soft-
ener Company, "reserving the right of requiring the con-
struction of the contract under the direction of the Water
Engineer in accordance with either Item 1-A or Item 1-B as
may be directed." On the 20th of March, 1914, that com-
pany entered into a contract with the City to do the work in
accordance with the specifications, subject to the following
provision:

"It is hereby expressly understood and agreed that
the right is hereby reserved to the Board of Awards
of said Mayor and City Council of Baltimore, to re-
quire the performance of the work under this con-
tract, under the direction of the Water Engineer, in
accordance with either alternative Item 1-A or 1-B as
may be directed by said Board of Awards, but in the
event that the City or the Contractor is enjoined from
constructing the work in accordance with Item 1-A,
then the Contractor shall have the right to change the
construction to that specified for Item 1-B."

The company also executed a bond as required by the speci-
fications, and on the 8th of April, 1914, before the work
under the contract was begun, the plaintiff filed the bill of
complaint in this case against the City, the members of the
Board of Awards, the Water Engineer and the American
Water Softener Company as we have already stated. The
Court below passed an order requiring the defendants to
show cause why the writ should not be issued as prayed. A
decree *pro confesso* was obtained against the contractor. The
other defendants answered, evidence was produced by the

parties, and on the 25th of March, 1915, the Court below passed the decree from which this appeal was taken.

In addition to the evidence to which we have already referred, George A. Johnson, a witness for the plaintiff, testified that he was a hydraulic engineer and sanitary expert of New York City, and that at the instance of the owners of the patents for the "Negative Head" process he came to Baltimore to see Mr. Whitman, the Water Engineer, in December, 1913, and that he pointed out to him that under Item 1-A the plans and specifications for the filter system involved the use of the patented process called "Negative Head." He further testified that the form of construction covered by Item 1-B of the specifications did not involve the use of the "Negative Head" process, and that it was generally accepted in the engineering profession that the patents for that process were valid and enforceable patents. Mr. Whitman testified that at the time of his conversation with Mr. Johnson he did not believe the patents referred to were valid, and that he told Mr. Johnson "that even if the patents were valid that by changing the construction of the filtration plant to some extent the patents * * * would not be infringed." He further stated that he did not agree with Mr. Johnson that the engineering profession accepted these patents as valid, and that the members of the profession with whom he had been thrown in contact did not so regard them, and had designed filtration plants without regard to the patents.

The appellant contends that the contract was void (1) because "it was based upon a bid which contained a material qualification in direct violation of the specifications," and the contract "was materially different from the contract contemplated by the advertisement for bids," and (2) because the contract was executed in "contravention of the statute" providing for alternative bids.

The questions involved in this controversy are, we think, disposed of by the cases of *Packard* v. *Hayes,* 94 Md. 233, and *Baltimore City* v. *Flack,* 104 Md. 107, and the cases

therein cited and relied upon, when read in connection with
the present sections of the Charter of Baltimore City regu-
lating the awarding and execution of contracts with the City.
The Charter of the city, as enacted by the Act of 1898, Chap-
ter 123, provided in section 14:

> "Hereafter in contracting for any public work or
> the purchase of any supplies or materials involving
> an expenditure of five hundred dollars or more for the
> City, or by any of the City departments, sub-depart-
> ments or municipal officers not embraced in a depart-
> ment, or special commissions or boards, unless other-
> wise provided for in this Article, proposals for the
> same shall be first advertised for, in two or more daily
> newspapers published in Baltimore City, for not less
> than ten nor more than twenty days, and the contract
> for doing said work or furnishing said supplies or
> materials, shall be awarded by the board provided for
> in the next section of this Article, and in the mode
> and manner therein prescribed."

Section 15 was as follows:

> "All bids made to the Mayor and City Council of
> Baltimore for supplies or work for any purpose what-
> ever, unless otherwise provided in this Article, shall be
> opened by a Board, or a majority of them, consisting
> of the Mayor, who shall be President of the same, the
> Comptroller, City Register, City Solicitor, and Pres-
> ident of the Second Branch, which Board, or a major-
> ity of them, shall, after opening said bids, award the
> contract to the lowest responsible bidder. The success-
> ful bidder shall promptly execute a formal contract to
> be approved as to its form, terms and conditions by
> the City Solicitor, etc."

In the case of *Packard* v. *Hayes, supra,* the Commissioner
for Street Cleaning advertised for proposals "for the collec-
tion and disposal of garbage, dead animals, ashes and mis-
cellaneous refuse in the city," and stated in the advertise-
ment that specifications and proposal blanks could be ob-

tained from the office of the commissioner. These specifications contained the provision that "each bidder must submit with his bid the scheme of garbage disposal which he proposes to establish, marked so as to correspond to the proposal which it is intended to accompany, and including such plan, specifications and other information as may be necessary to enable said commissioner to determine the feasibility of it." The specifications also made provision "for six different proposals." When the bids were opened it was found that the lowest bidder did not accompany his bid with a proposal for any sanitary scheme for disposal of garbage, etc., but proposed to move it to and use it as a fertilizer on his farm, or to reduce it according to any scheme of reduction that the Commissioner of Street Cleaning should approve. His bid was not considered, and the Commissioner of Street Cleaning, to whom the bids were referred by the Board of Awards, reported that the bidder did not comply with the specifications because he did not present any sanitary scheme of disposal as was required. The next lowest bidder, the appellee, proposed to collect and remove the garbage to a suitable place in or out of the city and there reduce it by a method then in use in Syracuse, New York, or with such modifications of that method, or by such other method as the Commissioner of Street Cleaning should approve. No plan of the system proposed to be used was filed by the bidder, but later he sent to the commissioner and to the board plans and specifications of a system for reducing the garbage in use in Detroit. All of the bidders proposed a different system for the reduction and disposal of garbage, and the contract was awarded to the appellee according to the sixth proposal provided for in the specifications. Thereupon the appellant, on his own behalf as a taxpayer and on behalf of other taxpayers, filed a bill of complaint for an injunction to restrain the carrying out of the contract upon the ground "that the requirements of the charter," as expressed in the sections we have referred to, "were not observed in awarding the con-

tract; and that the same was not awarded according to competitive bidding as therein contemplated."

In disposing of the case, the Court, after stating that the power of the Board of Awards was limited by section 15 to awarding the contract to the lowest responsible bidder; that it had no power to make a contract other than that contemplated by the specifications, and that no such power or authority was vested in any other city official after proposals are made in response to advertisement for them, said: "Necessarily, then, all the essentials that the municipality designs that the contract proposed to be made shall contain, is to be determined before proposals are invited and are to be placed before the bidder as the basis of his bid. Otherwise there would be no standard by which bidding could be made with the definiteness and precision which would leave nothing to be done except to ascertain the lowest bid. And it may be said there could be no effective competition in bidding which it was the evident design of the provisions of the charter we are considering to secure. That proposals for contracts under these provisions should be made by bidders with knowledge of and with reference to all the essential elements of the contract into which they are invited to enter is enforced by other considerations. How otherwise could the Board of Awards perform its only other function in this connection, after declaring a party the lowest bidder and 'award the contract' to him? This Board has no concern with the features, provisions or elements of the contract it is to award; and its award therefore must be of a contract the essential features, provisions and elements of which are already determined. It is also provided that when the Board of Awards has acted upon the bids the successful bidder must '*promptly* execute a formal contract to be approved as to its form, terms and conditions by the City Solicitor.' Now the City Solicitor is not authorized to make the contract nor to add to or take from one that is proposed and accepted between the city and the bidder. He is only author-

ized to see that the contract made is put into form and form-
ally executed." Having thus defined the power of the City
under these sections of the Charter, after stating that the
specifications provided for no scheme or method of disposal
of garbage, but each bidder was instructed to present for
himself a scheme of garbage disposal; that each bidder did
present a different scheme, and that no bid was made or
could have been made with reference to any ascertained
standard or upon any definite basis; that the specifications
provided that each bidder should include with the scheme of
garbage disposal he proposed to establish "such plan, speci-
fications and other information as might be necessary to en-
able the Commissioner of Street Cleaning to determine the
feasibility of it," the Court said further: "It is needless,
however, to speculate as to the intent of the provision in
question (the provision last referred to). The Commis-
sioner of Street Cleaning has no such power in reference to
contracts to be made under the law applicable in such a
case as this, as was thus reserved to him in the specifications.
After the bids have been submitted and opened the whole
power as to awarding the contract is with the Board of
Awards and we have seen what that power is. The object
of the provisions of the municipal charter we are consider-
ing is to prevent favoritism and extravagance in the making
of municipal contracts. The effect of these provisions to
produce the result intended would be greatly impaired, and
the purpose of them might be entirely defeated if the method
of awarding contracts under them which was pursued in this
case could be sustained. The absence of any definite and
precise basis for competition among bidders; the allowing
of each bidder to submit his own independent proposition as
to what would form an important element of the contract;
and the reservation of a discretion to be exercised by a mu-
nicipal authority as to an essential of the contract after bids
had been submitted, make the contract here the subject of
controversy violative of the intent and purpose of the pro-

visions of the law in question as well as of the essential
character of competitive bidding."

In the case of *Baltimore City* v. *Flack, supra,* the Com-
missioners for Opening Streets advertised "for separate
sealed proposals to be addressed to the Board of Awards, to
curb, gutter and pave with asphalt block, bithulithic or vit-
rified brick pavement Twenty-fifth street * * * , in accord-
ance with separate specifications, plans and profiles drawn
for each of the three kinds of pavement, and then on file in
the office of the Commissioners for Opening Streets.     * * *
Bids were submitted by different parties for doing the work
with each of the specified materials. When the bids were
opened the bid of the Barber Asphalt Company was rejected
because it was not framed in accordance with the prescribed
specifications, and thereupon the Commissioners for Open-
ing Streets selected bithulithic as the material with which
the paving was to be done; and then the Board of Awards
awarded the contract to the Warren Brothers Company at
the price of two dollars and eighteen cents per square yard
of bithulithic pavement, that being the lowest price bid for
that material, although the lowest price bid on vitrified brick
was two dollars and nine cents per square yard. The bid
on the asphalt block pavement was two dollars and sixty-five
cents per square yard. The contract was entered into be-
tween the Warren Brothers Company and the City for the
laying of a bithulithic pavement on the street named at the
price bid by their company. After the work under the con-
tract had been commenced two bills in equity were filed in
the Circuit Court of Baltimore City by certain taxpayers of
the City to procure a decree annulling the contract * * * ,
and to obtain an injunction restraining the City, its officers
and agents and the Warren Brothers Company from pro-
ceeding to lay the pavement under the contract." One of the
grounds upon which relief was sought was that under sections
14 and 15 of the City Charter "the Commissioners had no
authority to put different materials in competition with each

other, and no power, after the bids on those materials had
been opened, to select one of those materials for the paving,
unless they selected the one upon which the lowest price of all
the prices submitted was bid." The lower Court held that
sections 14 and 15 of the City Charter had not been com-
plied with in awarding the contract, and that the contract
with the Warren Brothers Company was invalid "because
theirs was not the lowest of all the submitted bids," and an
injunction was issued restraining the prosecution of the work
under it. The decree of the lower Court was reversed on
appeal, and CHIEF JUDGE McSHERRY, after saying that the
bid of the Barber Asphalt Company was properly rejected
because it did not conform to the specifications, stated the
question involved as follows: "Thus competition was in-
vited and secured both as to materials and as to price, and
the contract was awarded to the lowest responsible bidder
on the material selected, though there was another bidder
whose price was lower on a different material. Was this
method of procedure and this action in violation of sections
14 and 15 of the Charter?" He then said: "There are two
kinds of competition—the one, competition between different
*things* which will equally answer the same general purpose;
and the other, competition between the prices bid respectively
upon *each* of those distinct things. * * * It can not be
successfully asserted, in view of the comprehensive powers
given by the Act of 1904, that the Annex Commission is
without authority to select the kind of pavement to be laid,
or to select it before any bids are asked upon the specifica-
tions describing *that* kind of pavement. What difference is
there, or can there be—looking solely to the extent of that
authority—between selecting the kind of pavement *before*
bids are asked for, and selecting the kind of pavement after
the bids have been received and opened, upon distinct sets
of specifications descriptive of wholly different kinds of pave-
ments, but all of which are suited to the general purpose?"
After stating: "With the competition which relates exclu-
sively to the *kind* of pavement the provisions of sections 14

and 15 have nothing to do, since they only apply to competition in price—they apply to the *lowest* responsible *bidder,* and not to the lowest priced and least suitable material," he then refers to and relies upon the "leading case" of *Attorney-General, etc.,* v. *City of Detroit,* 26 Mich. 263, and quotes among others the following paragraph of JUDGE COOLEY's opinion: "When bids are thus called for, all bidders for a particular kind of pavement are bidders against all others in a certain sense, but they are also bidders against each other in a more particular sense. It would be the duty of the council when all bids are in to examine all and to select the kind of pavement for which the bids, all things considered, were relatively the lowest. They might thus perhaps reject the kind they would have preferred in advance, but for which they find all bids exorbitant, and determine upon another because, in their opinion, the offers made for it are more satisfactory. But when the kind is selected they have no discretion to be exercised in a choice between responsible bidders. The lowest has an absolute right to the contract." He also quotes among others the following paragraphs of the separate opinion of CHIEF JUDGE CHRISTIANCY in that case: "The notice by referring to the respective specifications gave an equal opportunity to all persons, not only to enter into competition with those seeking to contract for any *other* kind, but also (within the letter and spirit of the Charter) to compete with all who choose to bid for any *one particular kind.*

"But those bids only which had reference to the same particular kind, and to the same specifications, could be considered as competing bids, for the purpose of determining who was the lowest bidder within the meaning of the Charter."

Coming to the Maryland cases CHIEF JUDGE MCSHERRY said that in *Packard* v. *Hayes, supra,* there was no competitive bidding, and after repeating the statement of JUDGE JONES, which we have quoted above, he said in reference to the case then under consideration: "All the elements required

to enable the bidder to submit intelligently his proposal on the
kind of pavement he might offer to lay, were plainly and
minutely described in the set of specifications relating to that
character of pavement 'before proposals were invited' and no
essential of the contract was reserved for the exercise of any
discretion by the municipal authorities after the bids had
been submitted;" and in conclusion he said: "That the
Commissioners for Opening Streets had the power to put
asphalt block, bithulithic and vitrified brick pavements in
competition with each other, and after the bids had been
opened by the Board of Awards, to select the one of the
three pavements to be used, and that the Board of Awards
had the power to award the contract to the lowest responsible
bidder upon the kind or character of the pavement so
selected."

These decisions determine that while under the sections
of the Charter referred to, as enacted by the Act of 1898,
there may be competition between different *things* as well as
competition between prices bid respectively upon *each* of those
different things, the *thing* or *things* for which the City invites
proposals must be determined in advance of the advertisement
for bids, and there can be no departure in the proposals from
the specifications in regard to those things, and that where
the advertisement calls for bids on two or more things, after
the proposals or bids are received and opened, the Board of
Awards, or other agent of the City authorized to do so, must
determine which of the things they desire to adopt, and the
Board of Awards must then award the contract to the lowest
responsible bidder for that particular *thing, without reserva-
tion* of any discretion to be exercised by the municipal author-
ities as to an essential of the contract.    The reason for so
holding is perfectly apparent.    As said, the object of these
sections of the Charter was "to prevent favoritism and extrav-
agance in the making of municipal contracts."    There can be
no competition as to a thing or things indefinite and unde-
termined, and if, where they are determined, the proposals
or contract awarded could depart from the specifications, it

624      KONIG vs. M. & C. C. OF BALTO.

Opinion of the Court.                    [126

would defeat the competition sought to be obtained, and result in a contract for a thing for which there had been no competitive bidding. The same result would follow the reservation of any discretion to be exercised by the municipal authorities as to an essential of the contract. This rule is in accord with the one recognized in other states, and to the cases cited and relied upon in the Maryland cases referred to, we may add the cases of *Inge et al.* v. *Board of Public Works of Mobile,* 135 Ala. 187; *Diamond* v. *City of Mankato,* 89 Minn. 48, 61 L. R. A. 448; *Wickwire* v. *City of Elkhart,* 144 Ind. 305, 43 N. E. 216. In the case of *Inge* v. *Board of Public Works of Mobile* the Supreme Court of Alabama said: "The basis of the bidding and the contract entered into should be the same, for otherwise the very object and purpose of the law in calling for competitive bidding might be thwarted. 'To require the bids upon one basis and award the contract upon another would, in practical effect, be an abandonment of all bids.' *Wickwire* v. *City of Elkhart,* 43 N. E. 218; to the same effect *People* v. *Board of Improvement,* 43 N. Y. 229; *Shaw* v. *City of Trenton,* 49 N. J. Law, 339. Any material departure in the contract awarded from the terms and conditions upon which the bidding is had, renders the contract, in a sense, a private one. To permit such in the awarding of public contracts by public officers, would be to open wide the door for favoritism, and defeat the thing which the law intended to safeguard in requiring the contracts to be let upon bids made on advertised specifications. It is unimportant whether the additional stipulation contained in the contract awarded to one, who is not the lowest responsible bidder, be in itself an advantage to the City or not, if it constitutes a material change, and, therefore, a departure from the basis of the bidding, and becomes an element or consideration in the determination of who is the lowest and *best* bidder, it will invalidate the contract entered into." In the case of *Diamond* v. *City of Makato, supra,* the Court said: "The law is well settled that where, as in this case, municipal authorities can only let a contract for public works

to the lowest responsible bidder, the proposals and specifications therefor must be so framed as to permit free and full competition. Nor can they enter into a contract with the best bidder containing substantial provisions beneficial to him, not included in or contemplated in the terms and specifications upon which bids were invited. The contract must be the contract offered to the lowest responsible bidder by advertisement," and in the case of *Wickwire* v. *Elkhart, supra,* the Court said: "It is clearly implied from the language and purpose of the statute as if distinctly written in words that the contract must be the result of competition. In *Platter* v. *Elkhart Co.,* 103 Ind. 360, it was said: 'The provisions of a statute intended to prevent favoritism and insure fair competition upon equal terms to all who choose to compete in bidding, are enforced with a firm hand.' Was the contract in question the legitimate result of the competition offered by the council? If the council could strike from the bid the objectionable features therein, a proposition we do not consider, it is difficult to see how the contract could be made upon a basis entirely different from that contemplated by the specifications and form of bids supplied. It is, it seems to us, perfectly clear that all competitors were entitled to place their bids upon the basis upon which the contract was to be awarded and that to require bids upon one basis and award the contract upon another was, in practical effect, but to abandon all bids."

After the decision in *Baltimore* v. *Flack, supra,* the Legislature by the Act of 1908, Chapter 163, page 589, amended section 15 of the City Charter so as to provide for alternative bids, etc., as follows:

"15. All bids made to the Mayor and City Council of Baltimore for supplies or work for any purpose whatever, unless otherwise provided in this Article, shall be opened by a board, or majority of them, consisting of the Mayor, who shall be the President of the same, the Comptroller, City Register, City Solicitor, and the President of the Second Branch, which board, or majority of them, shall, after opening said

bids, award the contract to the lowest responsible bid-
der, provided, however, that whenever alternative bids
are invited for two or more different things, then the
said board shall have power and authority, in its dis-
cretion, after all bids have been opened, to select the
particular thing which shall be adopted, and there-
upon the said board shall award the contract to the
lowest responsible bidder for and upon the particular
thing so selected," etc.

It is therefore clear that under section 15 as amended,
and the authorities referred to, it was the duty of the Board
of Awards, after all the bids were opened, to have first deter-
mined which of the two processes, Item 1-A or Item 1-B,
should be adopted, and after having made the selection, to
have *then* awarded the contract to the lowest responsible
bidder for the work according to *that* process. That the
Board of Awards did not do.

The bid of the American Water Softener Company, so far
as Item 1-A was concerned, was not a proposal to construct
the "Filter Equipment" according to the specifications for
the sum or prices named in its bid, but an offer to do so *pro-
vided* that if that company or the city was enjoined from
doing it the company should have the right to build the
"Filter Equipment" under the specifications for Item 1-B.
That was a wide and vital departure from the proposals ad-
vertised for and contemplated by the specifications, and en-
abled the company to bid for the work under Item 1-A with-
out having to obtain a license to use the patents involved, or
incurring the risk of loss or damage by reason of infringe-
ment of those patents, against which it had, according to the
specifications, to protect the city.

The Board of Awards did not award the contract for the
"Filter Equipment" according to specifications for Item 1-B
to the American Water Softener Company as the lowest *re-
sponsible* bidder for *that* work, but awarded a contract to that
company, reserving to the board "the right of requiring the
construction of the contract under the direction of the Water

Engineer in accordance with *either* Item 1-A or Item 1-B, as may be directed," and the contract between that company and the city contained the same reservation and the stipulation referred to in that company's bid. It is apparent that the proposal of the American Water Softener Company was not submitted in accordance with the specifications, and that the contract awarded to that company, and entered into by it and the city, was not the contract or *thing* for which bids or proposals were invited by the advertisement, or for which there was competitive bidding.

In view, therefore, of the clear purpose of the sections of the charter referred to, their obvious purport and meaning, and the settled principles applicable to the exercise of the authority and powers thereby conferred, there is no escape from the conclusion that the contract involved in this controversy was utterly void.

It is suggested in the brief of the appellee that as the work would probably be completed before the decision of this Court was "handed down," no injunction would be issued restraining the execution of a contract "already completed."

At the time the bill was filed the work under the contract had not been started, and while it is stated in the evidence that at the time of the trial in the Court below about fifty per cent. of the work had been done, this Court has no way of knowing that it has been fully completed. But apart from that, the acts of the parties after the bill was filed cannot deprive the Court of its jurisdiction. It is said in 1 *High on Injunctions* (4th Ed.), sec. 5a: "And equity will not permit a wrongdoer to shelter himself behind a suddenly or secretly changed *status,* although he succeeded in making the change before the hand of the chancellor has actually reached him. And where, before the granting of the injunction, the defendant has thus changed the condition of things, the Court may not only restrain further action by him, but may also, by preliminary mandatory injunction, compel him to restore the subject matter of the suit to its former condition." And it is said in *New Haven Clock Co.* v. *Kochersperger,* 175

Ill. 383, quoting from the syllabus: "The forced payment of a tax after the Court has acquired jurisdiction of a bill to enjoin the same is subject to the power of the Court to compel restoration, even though no preliminary injunction is granted; and such payment cannot be availed of as a defense to the bill upon the ground that, the tax having been paid, there was nothing to enjoin." The same rule is stated in 22 *Cyc.* 742, where a number of cases are cited in support of the text. This is not like the case of *Kenneweg* v. *Allegany County,* 102 Md. 119, where the Court, after the election, refused to strike down the Act under which the election was held, or the case of *Mills* v. *Green,* 159 U. S. 651, where it is stated in the syllabus: "When, pending an appeal from the judgment of a lower Court, and without any fault of the defendant, an event occurs which renders it impossible for the appellate Court, if it should decide the case in favor of the plaintiff, to grant him any effectual relief, the Court will not proceed to a formal judgment, but will dismiss the appeal."

For the reasons stated we think the plaintiff was entitled to have the contract annulled and the performance and execution thereof enjoined, and we must therefore reverse the decree of the Court below and remand the cause.

But in view of the fact that the contract was partly executed at the time of the trial of the case in the Court below, and the statement of counsel that it would probably be fully executed and completed before the case was decided by this Court, the extent to which relief by injunction may be granted, and the terms of the injunction, if any, that should be issued by the Court below must depend upon the status of the parties to the contract with reference to the performance thereof when the cause reaches that Court.

> *Decree reversed with costs, to the appellant, and cause remanded for further proceedings in accordance with the foregoing opinion.*