# JONES v. SECURITIES & EXCHANGE COMMISSION.

No. 640.   Argued March 10, 11, 1936.—Decided April 6, 1936.

2

*Messrs. Harry O. Glasser* and *James M. Beck,* with whom *Messrs. Bainbridge Colby, J. N. Saye,* and *H. I. Fishbach* were on the brief, for petitioner.

*Mr. John J. Burns,* General Counsel, Securities & Exchange Commission, and *Solicitor General Reed,* with whom *Messrs. Charles E. Wyzanski, Jr.,* and *Alger Hiss* were on the brief, for respondent.

6

Mr. Justice Sutherland delivered the opinion of the Court.

This case arises under "The Securities Act of 1933," c. 38, 48 Stat. 74, U. S. C. Title 15, § 77a *et seq.,* as amended by act of June 6, 1934, c. 404, 48 Stat. 881. Prior to the

amendment, the act was administered by the Federal Trade Commission; but by § 210, 48 Stat. 908, the administration was transferred to the respondent.

The act, § 2 (4), defines the term "issuer" as including every person who issues or proposes to issue any security, with certain exceptions. Section 6 (a) of the act provides—"Any security may be registered with the Commission under the terms and conditions hereinafter provided, by filing a registration statement in triplicate, at least one of which shall be signed by each issuer . . ." The filing of the registration statement must be accompanied by the payment to the commission of a fee measured by the maximum aggregate price at which the securities are to be offered. The information contained in the statement is to be made available to the public under such regulations as the commission may prescribe. The act prescribes in detail the character of information which is to be set out in the statement. Elaborate provisions are made in respect of liability on account of false registration statements, etc., and penalties are imposed for willful violations of any of the provisions of the act, or the rules and regulations promulgated by the commission under authority thereof, and for willfully untrue statements of material facts or omissions to state material facts. Section 5 (a) provides that unless a registration statement is in effect as to a security, it shall be unlawful for any person directly or indirectly to make use of the instrumentalities of interstate commerce or of the mails to sell or offer to buy such security, etc., or to transport any such security for sale or for delivery after sale.

"Sec. 8 (a) The effective date of a registration statement shall be the twentieth day after the filing thereof, except as hereinafter provided, . . .

"(d) If it appears to the Commission at any time that the registration statement includes any untrue statement of a material fact or omits to state any material fact

required to be stated therein or necessary to make the statements therein not misleading, the Commission may, after notice by personal service or the sending of confirmed telegraphic notice, and after opportunity for hearing (at a time fixed by the Commission) within fifteen days after such notice by personal service or the sending of such telegraphic notice, issue a stop order suspending the effectiveness of the registration statement. . . .

"(e) The Commission is hereby empowered to make an examination in any case in order to determine whether a stop order should issue under subsection (d). In making such examination the Commission or any officer or officers designated by it shall have access to and may demand the production of any books and papers of, and may administer oaths and affirmations to and examine, the issuer, underwriter, or any other person, in respect of any matter relevant to the examination, and may, in its discretion, require the production of a balance sheet exhibiting the assets and liabilities of the issuer, or its income statement, or both, to be certified to by a public or certified accountant approved by the Commission. If the issuer or underwriter shall fail to coöperate, or shall obstruct or refuse to permit the making of an examination, such conduct shall be proper ground for the issuance of a stop order."

Section 19 (b) provides that for the purpose of all investigations which the commission think necessary and proper for the enforcement of the act, any member of the commission or any designated officer may administer oaths and affirmations, subpoena witnesses, take evidence, and require the production of books, papers, etc. Section 22 (b) provides that in case of contumacy or refusal to obey a subpoena issued [by authority of the commission] to any person, the district courts of the United States and others named, upon application by the commission, may issue to such person an order requiring him to appear

before the commission or one of its examiners, and there produce documentary evidence and give evidence touching the matter in question.

May 4, 1935, petitioner filed with the commission a registration statement in pursuance of § 6 (a) of the act, covering a proposed issue of participation trust certificates. This registration statement under the terms of the act was to become effective 20 days later. On the 19th day, however, the commission, having already directed that stop-order proceedings be instituted, pursuant to § 8 (d), sent petitioner a telegraphic notice reciting that the registration statement appeared to contain untrue statements of material facts and to omit material facts required and necessary and fixing a hearing at the office of the commission for Thursday, June 6, 1935, "at which time and place registrant may appear and show cause why a stop order should not be issued suspending the effectiveness of such registration statement." The hearing was postponed until June 18th.

On June 13, a subpoena *duces tecum* was issued commanding petitioner to appear before an officer of the commission on the 18th to testify with respect to his registration statement and to bring with him designated books, records and papers, listed as follows: "General ledger, subsidiary ledgers, journal, cash book, books of account and financial statements of J. Edward Jones; general ledger, journal, cash book and books of account of J. Edward Jones relating to J. Edward Jones Royalty Trust, Series 'M'; all contracts, agreements and correspondence of J. Edward Jones relating to the distribution of Participation Trust Certificates in J. Edward Jones Royalty Trust, Series 'M'; all correspondence and communications of J. Edward Jones with any State authority relating to the distribution of Participation Trust Certificates in J. Edward Jones Royalty Trust, Series 'M.'"

June 18, in a written communication to the commission, petitioner formally withdrew his application for registration, assigning as a reason, among others, that the commission's action had been given widespread publicity and placed him in a situation to be severely damaged. The same day, his counsel appeared before the examiner for the commission and presented this written withdrawal, which was marked for identification, but excluded from consideration. On June 27, counsel for petioner appeared again before the examiner, and filed a dismissal signed by petitioner dismissing "his registration statement heretofore filed" and withdrawing "all application for consideration thereof or action thereon." At the same time, petitioner's counsel filed a motion to dismiss and for an order from the commission permitting the withdrawal of the registration statement and dismissing the registration proceeding and all matters pertaining thereto at petitioner's cost, and also a motion to quash the subpoena which had been issued and served on petitioner. The examiner acting for the commission denied the motions and refused to allow the withdrawal, no reason for his action being assigned. In so doing, the commission and its examiner assumed to act under and in conformity with a regulation of the commission which provides as follows:.

"Any registration statement or any amendment thereto may be withdrawn upon the request of the registrant if the Commission consents thereto. The fee paid upon the filing of such registration statement shall not be returned to the registrant. The papers comprising the registration statement or amendment thereto shall not be removed from the files of the Commission but shall be plainly marked with the date of the giving of such consent and in the following manner: 'Withdrawn upon the Request of the Registrant, the Commission consenting

thereto.' Such consent shall be given by the Commission with due regard to the public interest and the protection of investors."

On June 28th, petitioner filed with the court below a petition asking for a review of the commission's rulings which that court dismissed for lack of jurisdiction. A petition for a writ of certiorari to review that action was denied by this court. 297 U. S. 705.

July 3, 1935, the commission filed an application in a federal district court for an order requiring petitioner to appear before the examiner to give evidence in the matter of petitioner's registration statement. Petitioner appeared and challenged, among other things, the validity of the orders of the commission denying petitioner's right to withdraw his registration statement, overruling his motions to withdraw and dismiss the proceedings and refusing to quash the subpoena which had been issued and served on petitioner. The district court denied petitioner's contentions and entered an order directing him to appear before the commission at a time and place fixed, to testify in the matter of the registration statement and to answer all pertinent questions regarding the information and documents filed by him with the commission in respect of such statement. 12 F. Supp. 210. On appeal, the court of appeals affirmed this order. 79 F. (2d) 617.

The principal points urged by petitioner as ground for reversing the judgment below, and the only ones that need be stated, are as follows: That the commission was bound as matter of law to sustain petitioner's withdrawal of and motion to withdraw the registration statement; that the right to withdraw such statement under the circumstances disclosed was unqualified; that the commission, therefore, was without authority to require petitioner to appear and testify or to submit his private books, records, and papers for the inspection of the com-

mission; that the Securities Act is unconstitutional, because it constitutes an attempt to exercise powers reserved to the states; and that it finds no warrant in either the commerce clause or in the power to regulate the use of the mails under the constitutional authority to establish post offices and post roads, or in any other provision of the federal Constitution.

*First.* By § 8 (d), when it appears to the commission that any untrue statement of a material fact has been made in the registration statement, or material facts have been omitted which are required or necessary to make the statements therein not misleading, the commission may institute an inquiry to determine whether a stop order shall issue suspending the effectiveness of the registration statement. Proceeding under that section, as we have seen, the commission, before the registration statement was to become effective by the terms of § 8 (a), directed that a stop-order proceeding be instituted, and caused to be served on petitioner a telegraphic notice fixing a time for him to "appear and show cause why a stop order should not be issued suspending the effectiveness of such registration statement."

Such a proceeding is analogous to a suit in equity to obtain an injunction, and should be governed by like considerations. Applying those considerations, then, what was the status of the registration statement pending the inquiry under § 8 (d)? Notwithstanding the provision of § 8 (a), that the effective date of a registration statement shall be the twentieth day after it is filed, did this intervening action of the commission nevertheless have the effect of suspending the effective operation of the statement pending the hearing and determination of the stop-order proceeding? We are of opinion that it did have that effect. The rule is well settled, both by the courts of England and of this country, that where a suit is brought to enjoin certain acts or activities, for example,

the erection of a building or other structure, of which suit the defendant has notice, the hands of the defendant are effectually tied pending a hearing and determination, even though no restraining order or preliminary injunction be issued. We briefly review some of the decisions.

In *Daniel* v. *Ferguson*, L. R. [1891] 2 Ch. 27, suit had been brought to restrain defendant from building so as to darken plaintiff's lights. Notice of motion for a temporary injunction to be made upon a designated future day was served on the defendant. After receiving notice, the defendant put on a large number of men and proceeded with his building, running a wall up to a height of about 39 feet from the ground before the injunction was granted. The court, without regard to the ultimate rights of the parties, held that the wall thus run up by defendant should be torn down at once, as an attempt to anticipate the order of the court. A like situation was presented in *Von Joel* v. *Hornsey,* L. R. [1895] 2 Ch. 774. In that case, the evidence showed that defendant had repeatedly evaded attempts to serve him with process, and in the meantime had gone on with the building. Again, without regard to the ultimate rights of the parties, the court directed defendant to pull down that part of the building thus erected.

The Supreme Court of Pennsylvania in several cases has followed the same rule. *Clark* v. *Martin*, 49 Pa. 289, 298–299; *Easton Passenger Ry. Co.* v. *Easton*, 133 Pa. 505, 519; 19 Atl. 486; *Cooke* v. *Boynton*, 135 Pa. 102; 19 Atl. 944; *Meigs* v. *Milligan*, 177 Pa. 66, 72, 76; 35 Atl. 600; *Fredericks* v. *Huber*, 180 Pa. 572, 575; 37 Atl. 90. In *Cooke* v. *Boynton*, a bill in equity had been filed praying for a preliminary and perpetual injunction preventing defendants from interfering with a certain tramway of the plaintiff. Before a preliminary injunction was obtained, the defendants, on three separate occasions, had

torn up the track which the plaintiffs had replaced. The third incident occurred while plaintiff was obtaining a preliminary injunction. The court said, "The writ was served just as they had finished the work of demolition, and this coincidence is strongly suggestive of a race against the law." The trial court had dissolved the injunction, in part on the ground that the act sought to be restrained had already been done, and that it was without power at that stage of the cause to restore the property to its former condition by mandatory injunction. The supreme court reversed. "What we did in the Easton case," the court said, p. 110, "we will do here. We will restore the injunction, without passing upon the merits of the case. They will be considered when it comes here upon final hearing."

In *New Haven Clock Co.* v. *Kochersperger,* 175 Ill. 383; 51 N. E. 629, the state supreme court held that the forced payment of a tax after the court has acquired jurisdiction of a bill to enjoin its collection may be restored by the court, even though no preliminary injunction was granted; and that such payment cannot be availed of as a defense upon the ground that the tax having been paid there is nothing to enjoin. The same court in *Turney* v. *Shriver,* 269 Ill. 164, 172; 109 N. E. 708, held the rule to be that "where a bill for injunction has been filed and the court has acquired jurisdiction of both the person and the subject matter of the suit and the defendant does any act which the bill seeks to enjoin, such party acts at his peril and subject to the power of the court to compel a restoration of the status, . . . ." See also, *Konig* v. *M. & C. C. of Balto.,* 126 Md. 606, 627; 95 Atl. 478.

The conclusion to be drawn from all the cases is that after a defendant has been notified of the pendency of a suit seeking an injunction against him, even though a temporary injunction be not granted, he acts at his

18

peril and subject to the power of the court to restore the status, wholly irrespective of the merits as they may be ultimately decided. 1 High on Injunctions (4th ed.), § 5 (a).

We hold the principle of this rule to be applicable to the present case. When proceedings were instituted by the commission and the registrant was notified and called upon to show cause why a stop order should not be issued, the practical effect was to suspend, pending the inquiry, all action of the registrant under his statement. Unless the registration statement is effective, the issuer of a security who makes use of the mails or of the instrumentalities of interstate commerce to sell the security or to carry the same for the purposes of sale or delivery after sale, § 5 (a) of the act, is liable to severe penalties of fine and imprisonment. § 24. The word "effective," as here employed, connotes completeness of operative force and freedom to act. And a registration statement which, while still *in fieri,* is brought under official challenge in respect of its validity and subjected to an official proceeding aimed at its destruction, cannot be so characterized until the challenge is determined in favor of the registrant. In the meantime, since he can act only at his peril, the registration statement can in no real sense be called effective.

*Second.* In this situation, does a registrant have the unqualified right to withdraw his registration statement or, in other words, to dismiss a pending proceeding by which, for his own advantage, he is seeking the use of the mails and the instrumentalities of interstate commerce? If he have such right, there is no basis for the exercise of discretion in respect of the matter on the part of the commission; for it is obvious that discretion does not exist where there is no power to act except in one way. Cf. *Detroit* v. *Detroit City Ry. Co.,* 55 Fed. 569, 573; *Ex parte Skinner & Eddy Corp.,* 265 U. S. 86, 93.

The act contains no provision upon the subject; and it may not be construed as attempting to confer upon the commission an arbitrary power, under rule or otherwise, to deny, without reason, a motion to dismiss. We are unable to find any precedent for the assumption of such power on the part of an administrative body; and we go to the practice and rules of the courts in order to determine by analogy the scope and limit of the power; for, at least in the absence of a statute to the contrary, the power of a commission to refuse to dismiss a proceeding on motion of the one who instituted it cannot be greater than the power which may be exercised by the judicial tribunals of the land under similar circumstances. Both parties here seem to recognize the appositeness of this test.

The general rule is settled for the federal tribunals that a plaintiff possesses the unqualified right to dismiss his complaint at law or his bill in equity unless some plain legal prejudice will result to the defendant other than the mere prospect of a second litigation upon the subject matter. *Pullman's Palace Car Co.* v. *Transportation Co.,* 171 U. S. 138, 145–146. In announcing the rule, this court approved and cited as authority the decision rendered by Chief Justice Taft, then circuit judge, in *Detroit* v. *Detroit City Ry. Co.,* 55 Fed. 569. The opinion in the latter case, reviewing the English and American authorities, states the rule as follows [p. 572]:

"It is very clear from an examination of the authorities, English and American, that the right of a complainant to dismiss his bill without prejudice, on payment of costs, was of course except in certain cases. . . . The exception was where a dismissal of the bill would prejudice the defendants in some other way than by the mere prospect of being harassed and vexed by future litigation of the same kind."

*Chicago & Alton R. Co.* v. *Union Rolling Mill Co.*, 109 U. S. 702, 713–715; *Barrett* v. *Virginian Ry. Co.*, 250 U. S. 473, 476; *McGowan* v. *Columbia River Packers' Assn.*, 245 U. S. 352, 358; *Veazie* v. *Wadleigh,* 11 Pet. 55, 61–62; *Confiscation Cases,* 7 Wall. 454, 457–458. The foregoing decisions, together with others, are reviewed in an opinion delivered by Chief Justice Taft in *Ex parte Skinner & Eddy Corp.*, 265 U. S. 86, and the conclusion stated as follows:

"The right to dismiss, if it exists, is absolute. It does not depend on the reasons which the plaintiff offers for his action. The fact that he may not have disclosed all his reasons or may not have given the real one can not affect his right.

"The usual ground for denying a complainant in equity the right to dismiss his bill without prejudice at his own costs is that the cause has proceeded so far that the defendant is in a position to demand on the pleadings an opportunity to seek affirmative relief and he would be prejudiced by being remitted to a separate action. Having been put to the trouble of getting his counter case properly pleaded and ready, he may insist that the cause proceed to a decree. . . .

"The Government had not when the case was dismissed given any time or expense to the preparation and filing of a cross bill or of the evidence to sustain it. It had not taken any action in respect to the cause which entitled it to say that it would be prejudiced by a dismissal within the meaning of the authorities. It suddenly was awakened by the motion to dismiss to the fact that by eighteen months' delay, it was losing a possible opportunity to litigate a cross claim in the Court of Claims and without a jury. We think the same rule should obtain in the procedure of the Court of Claims as in federal courts of law and equity in respect to the dismissal of cases without prejudice."

The commission apparently concedes that in the absence of a regulation to the contrary, the foregoing general rule would be applicable. The commission, however, relying upon our recent decision in *Bronx Brass Foundry, Inc.* v. *Irving Trust Co.*, 297 U. S. 230, contends that its regulation, quoted *ante,* justifies the adverse action of the commission. In the *Brass Foundry* case, proof of a claim in bankruptcy had been filed. The trustee in bankruptcy moved to expunge the claim on the ground that the creditor had received certain payments on account which constituted unlawful preferences. Several hearings were held before the referee, and the evidence indicated that the contention of the trustees was well founded. Before the hearing closed, the creditor filed a withdrawal of its claim and abandoned the hearing. The trustee insisted that it was entitled to an adjudication whether the payments made were unlawful preferences. The referee refused to permit a withdrawal of the claim; and his action was approved by the district court, and its judgment in turn affirmed by the circuit court of appeals having jurisdiction. We affirmed, holding that the general rule as stated in *Ex parte Skinner & Eddy Corp., supra,* had been modified by a rule of the district court which authorized the court to refuse, after issue joined, "to permit the plaintiff to discontinue even though the defendant cannot have affirmative relief under the pleadings, and though his only prejudice be the vexation and expense of a possible second suit upon the same cause of action."

Assuming, without deciding, that the regulation of the commission was within its power and in force, it differs essentially from the foregoing rule of the district court. As applied to this proceeding in which there are no adversary parties, the regulation does not restrict the common-law rule. That rule, as we have seen, is that the right to dismiss is unqualified unless the dismissal would legally prejudice the defendants in some other

way than by future litigation of the same kind. The regulation is "Any registration statement or any amendment thereto may be withdrawn upon the request of the registrant if the commission consents thereto. . . . Such consent shall be given by the commission with due regard to the public interest and the protection of investors." This regulation is quite as general as the rule of the common law, and the possibility that the same registration may be attempted in the future is not within its terms any more than it is within the terms of the common-law rule. The question under the regulation is whether due regard to the public interest and the protection of investors requires that the withdrawal be denied. The test is the absence or presence of prejudice to the public or investors; and, plainly enough, under the decisions of this court, the doctrine that a dismissal must be granted if no prejudice be shown beyond the prospect of another suit, *unless there be a specific rule of court to the contrary,* is applicable, and the withdrawal should have been allowed as of course.

We are unable to find anything in the record, the arguments of the commission, or the decision of the court below that suggests the possibility of any prejudice to the public or investors beyond the assumption, as put by the court below, 79 F. (2d) at p. 620, that "an unlimited privilege of withdrawal would have the effect of allowing registrants whose statements are defective to withdraw before a stop order was issued and then to submit another statement with slight changes."

In this proceeding, there being no adversary parties, the filing of the registration statement is in effect an *ex parte* application for a license to use the mails and the facilities of interstate commerce for the purposes recognized by the act. We are unable to see how any right of the general public can be affected by the withdrawal of such an application before it has gone into effect. Peti-

tioner emphatically says that no steps had been taken looking to the issue of the securities; and this is not denied. So far as the record shows, there were no investors, existing or potential, to be affected. The conclusion seems inevitable that an abandonment of the application was of no concern to anyone except the registrant. The possibility of any other interest in the matter is so shadowy, indefinite, and equivocal that it must be put out of consideration as altogether unreal. Under these circumstances, the right of the registrant to withdraw his application would seem to be as absolute as the right of any person to withdraw an ungranted application for any other form of privilege in respect of which he is at the time alone concerned.

An additional reason why the action of the commission and of the court below cannot be sustained is that the commission itself had challenged the integrity of the registration statement and invited the registrant to show cause why its effectiveness should not be suspended. In the face of such an invitation, it is a strange conclusion that the registrant is powerless to elect to save himself the trouble and expense of a contest by withdrawing his application. Such a withdrawal accomplishes everything which a stop order would accomplish, as counsel for the commission expressly conceded at the bar. And, as the court below very properly recognized, a withdrawal of the registration statement "would end the effect of filing it and there is no authority under § 19 (b) to issue the Commission subpoena and it could not be enforced by order of the district court under § 22 (b)." 79 F. (2d) 619.

The action of the commission finds no support in right principle or in law. It is wholly unreasonable and arbitrary.. It violates the cardinal precept upon which the constitutional safeguards of personal liberty ultimately rest—that this shall be a government of laws—, because to the precise extent that the mere will of an official or

24

an official body is permitted to take the place of allowable official discretion or to supplant the standing law as a rule of human conduct, the government ceases to be one of laws and becomes an autocracy.  Against the threat of such a contingency the courts have always been vigilant, and, if they are to perform their constitutional duties in the future, must never cease to be vigilant, to detect and turn aside the danger at its beginning.  The admonition of Mr. Justice Bradley in *Boyd* v. *United States,* 116 U. S. 616, 635, should never be forgotten: "It may be that it is the obnoxious thing in its mildest and least repulsive form; but illegitimate and unconstitutional practices get their first footing in that way, namely, by silent approaches and slight deviations from legal modes of procedure. . . . It is the duty of courts to be watchful for the constitutional rights of the citizen, and against any stealthy encroachments thereon.  Their *motto* should be *obsta principiis.*"

Arbitrary power and the rule of the Constitution cannot both exist.  They are antagonistic and incompatible forces; and one or the other must of necessity perish whenever they are brought into conflict.  To borrow the words of Mr. Justice Day—"there is no place in our constitutional system for the exercise of arbitrary power." *Garfield* v. *Goldsby,* 211 U. S. 249, 262.  To escape assumptions of such power on the part of the three primary departments of the government, is not enough.  Our institutions must be kept free from the appropriation of unauthorized power by lesser agencies as well.  And if the various administrative bureaus and commissions, necessarily called and being called into existence by the increasing complexities of our modern business and political affairs, are permitted gradually to extend their powers by encroachments—even petty encroachments— upon the fundamental rights, privileges and immunities of the people, we shall in the end, while avoiding the

fatal consequences of a supreme autocracy, become submerged by a multitude of minor invasions of personal rights, less destructive but no less violative of constitutional guaranties.

*Third.* The proceeding for a stop order having thus disappeared, manifestly it cannot serve as a basis for the order of the district court compelling petitioner to appear, give testimony, and produce his private books and papers for inspection by the commission. But the commission contends that the order may rest upon the general power to conduct investigations which it says is conferred by § 19 (b). The difficulty with that is that the investigation was undertaken for the declared and sole purpose of determining whether a stop order should issue. The first action taken by the commission was on May 20th, four days before the registration was to become effective under the statute. The commission then, after averring that upon reasonable grounds it believed the registration statement was false in material facts, directed that stop-order proceedings be instituted against the statement. It never has averred or directed anything else. This action was followed by a notice containing like recitals of a more detailed character, and calling upon the registrant to appear and show cause why a stop order should not be issued suspending the effectiveness of the statement. It was upon this direction and notice that all subsequent proceedings were had and upon which they must stand or fall. We do not interpret the order of the district court, the substance of which has already been stated, as resting upon a different view.

Nothing appears in any of the proceedings taken by the commission to warrant the suggestion that the investigation was undertaken or would be carried on for any other purpose or to any different end than that specifically named. An official inquisition to compel disclosures of fact is not an end, but a means to an end; and it is

26

a mere truism to say that the end must be a legitimate one to justify the means. The citizen, when interrogated about his private affairs, has a right before answering to know why the inquiry is made; and if the purpose disclosed is not a legitimate one, he may not be compelled to answer. Since here the only disclosed purpose for which the investigation was undertaken had ceased to be legitimate when the registrant rightfully withdrew his statement, the power of the commission to proceed with the inquiry necessarily came to an end. Dissociated from the only ground upon which the inquiry had been based, and no other being specified, further pursuit of the inquiry, obviously, would become what Mr. Justice Holmes characterized as "a fishing expedition . . . for the chance that something discreditable might turn up" (*Ellis* v. *Interstate Commerce Comm'n*, 237 U. S. 434, 445)—an undertaking which uniformly has met with judicial condemnation: *In re Pacific Ry. Comm'n*, 32 Fed. 241, 250; *Kilbourn* v. *Thompson*, 103 U. S. 168, 190, 192, 193, 195, 196; *Boyd* v. *United States*, 116 U. S. 616; *Harriman* v. *Interstate Commerce Comm'n*, 211 U. S. 407, 419; *Federal Trade Comm'n* v. *American Tobacco Co.*, 264 U. S. 298, 305–307.

*In re Pacific Ry. Comm'n* involved the power of a Congressional commission to investigate the private affairs, books and papers of officers and employees of certain corporations indebted to the government. That commission called before it the president of one of these corporations, required the production of private books and papers for inspection, and submitted interrogatories which the witness declined to answer. Acting under the statute, the commission sought a peremptory order from the circuit court to compel the witness to answer the interrogatories. The court, consisting of Mr. Justice Field, Circuit Judge Sawyer, and District Judge Sabin, denied the motion of the district attorney for the order

and discharged the rule to show cause. Opinions were rendered *seriatim,* the principal one by Justice Field. The authority of the commission was definitely denied. That decision has frequently been cited and approved by this court. Judge Sawyer, in the course of his opinion (at p. 263), after observing that a bill in equity seeking a discovery upon general, loose and vague allegations is styled "a fishing bill," and will, at once, be dismissed on that ground (Story, Eq. Pl. § 325), said: "A general, roving, offensive, inquisitorial, compulsory investigation, conducted by a commission without any allegations, upon no fixed principles, and governed by no rules of law, or of evidence, and no restrictions except its own will, or caprice, is unknown to our constitution and laws; and such an inquisition would be destructive of the rights of the citizen, and an intolerable tyranny. Let the power once be established, and there is no knowing, where the practice under it would end."

The fear that some malefactor may go unwhipped of justice weighs as nothing against this just and strong condemnation of a practice so odious. And, indeed, the fear itself has little of substance upon which to rest. The federal courts are open to the government; and the grand jury abides as the appropriate constitutional medium for the preliminary investigation of crime and the presentment of the accused for trial.

The philosophy that constitutional limitations and legal restraints upon official action may be brushed aside upon the plea that good, perchance, may follow, finds no countenance in the American system of government. An investigation not based upon specified grounds is quite as objectionable as a search warrant not based upon specific statements of fact. Such an investigation, or such a search, is unlawful in its inception and cannot be made lawful by what it may bring, or by what it actually succeeds in bringing, to light. Cf. *Byars* v. *United States,*

28

273 U. S. 28, 29, and cases cited. If the action here of the commission be upheld, it follows that production and inspection may be enforced not only of books and private papers of the guilty, but those of the innocent as well, notwithstanding the proceeding for registration, so far as the power of the commission is concerned, has been brought to an end by the complete and legal withdrawal of the registration statement.

Exercise of "such a power would be more pernicious to the innocent than useful to the public"; and approval of it must be denied, if there were no other reason for denial, because, like an unlawful search for evidence, it falls upon the innocent as well as upon the guilty and unjustly confounds the two. *Entick* v. *Carrington*, 19 Howell's St. Trials, 1030, 1074—followed by this court in *Boyd* v. *United States*, 116 U. S. 616, 629–630. No one can read these two great opinions, and the opinions in the *Pacific Ry. Comm'n* case, from which the foregoing quotation is made, without perceiving how closely allied in principle are the three protective rights of the individual—that against compulsory self-accusation, that against unlawful searches and seizures, and that against unlawful inquisitorial investigations. They were among those intolerable abuses of the Star Chamber, which brought that institution to an end at the hands of the Long Parliament in 1640. Even the shortest step in the direction of curtailing one of these rights must be halted *in limine*, lest it serve as a precedent for further advances in the same direction, or for wrongful invasions of the others.

*Fourth.* The foregoing disposes of the case and requires a reversal of the judgment of the lower court. In that view, it becomes unnecessary to consider the constitutional validity of the act.

*Reversed.*

MR. JUSTICE CARDOZO, dissenting.

I am unable to concur in the opinion of the court.

A subpoena *duces tecum* was issued by the Commission on June 13 before any attempt had been made to withdraw the registration statement. On June 18, the day of the attempted withdrawal, there was issued a second subpoena commanding the registrant to appear and testify, and this was served upon him by the Marshal. Then and for months earlier a standing Regulation gave warning to him and to the world that without the consent of the Commission there could be no withdrawal of a statement once placed upon the files. I am persuaded that the Rule is valid; that the Commission had abundant reasons for maintaining jurisdiction; and that notice of withdrawal did not nullify the writ.

The subpoena flouted by the witness was issued under § 19 (b) of the statute as well as under § 8 (e). So the sworn petition for the Commission explicitly informs us. It was issued in aid of any legitimate inquiry that the Commission had authority to initiate and prosecute by reason of a false and defective statement then part of the official records. Nothing in the case gives color to the argument that the witness was to be subjected to a roving examination without the restraints of pleadings or bounds analogous thereto. On the contrary, the order of the District Court upholding the subpoena directs him to make answer to questions pertinent to the documents already filed with the Commission, to these and nothing more. If the petitioner is to prevail in his attack upon the writ, it will have to be on broader grounds than those of form and method. He must be able to make good his argument that by the mere announcement of withdrawal, he achieved results analogous to those of a writ of prohibition.

Recklessness and deceit do not automatically excuse themselves by notice of repentance. Under § 24 of the Act, there is the possibility, at times the likelihood, of penal liability. A statement wilfully false or wilfully defective is a penal offense to be visited, upon conviction, with fine or imprisonment. Under § 12, there is the possibility, if not the likelihood, of liability for damages. The statement now in question had been effective for over twenty days, and the witness did not couple his notice of withdrawal with an affidavit or even a declaration that securities had not been sold. Nor is the statute lacking in machinery with which to set these liabilities in motion upon appropriate occasion. Under § 19 (b), plenary authority is conferred on the Commission to conduct all investigations believed to be necessary and proper for the enforcement of the Act and of any of its provisions. There will be only partial attainment of the ends of public justice unless retribution for the past is added to prevention for the future. But the opinion of the court teaches us that however flagrant the offense and however laudable the purpose to uncover and repress it, investigations under § 19 (b) will be thwarted on the instant when once the statement of the registrant has been effectively withdrawn. If that is so, or even indeed if the effect of the retraction is to embarrass the inquiry—to cloud the power to continue—the fairness of the Rule is proved out of the mouths of its accusers. If such consequences are inherent in a privilege of withdrawal indiscriminately bestowed, there is need of some restraint upon the power of the wrongdoer to mitigate the penalties attaching to his wrong. Shall the truth be shown forth or buried in the archives? The Commission is to determine in the light of all the circumstances, including its information as to the conduct of the applicant, whether the public interest will be prompted by forgetting and forgiving. *Bronx Brass Foundry, Inc.* v. *Irving Trust Co.*, 297 U. S. 230.

The objection is inadequate that an investigation directed to the discovery of a crime is one not for the Commission, but for the prosecuting officer. There are times when the functions of the two will coincide or overlap. Congress has made it plain that any inquiry helpful in the enforcement of the statute may be pursued by the Commission, though conduct punishable as a crime may thereby be uncovered. Indeed, the Act is explicit—§ 22 (c)—that a witness is not excused from testifying on the ground that the testimony required of him may tend to incriminate him or expose him to a penalty or forfeiture. He may, however, claim his privilege, and if then compelled to testify, may not be prosecuted thereafter for any matter thus revealed. All this is far from proving that there can be no practical advantage in keeping the proceeding open. Aside from the possibility of civil liability, the offender may not choose to claim the privilege, and even if he does, and is then excused from testifying, other witnesses may be available, for example, employes, who are not implicated in the offense and who can bring the facts to view. Moreover, amnesty for one offender may mean conviction for another, an associate in the crime. Inquiry by the Commission is thus more penetrating and efficient than one by a grand jury where there is no statutory grant of amnesty to compel confederates to speak. More important still, the enforcement of the Act is aided when guilt is exposed to the censure of the world, though the witness in the act of speaking may make punishment impossible. It is no answer to all this that upon the record now presented a crime has not been proved or even definitely charged. An investigator is not expected to prove or charge at the beginning the offenses which he has reason to suspect will be uncovered at the end. The petition in behalf of the Commission enumerates one by one the false statements and the omissions imputed to the registrant. Some at least are of

such a nature that if chargeable to him at all, they can hardly have been made otherwise than with criminal intent. To give the investigating officer an opportunity to reach down into the hidden wells of knowledge and the more hidden wells of motive is the very purpose of the Regulation by which the proceeding is kept open after the registrant has tried to end it.

The opinion of the court reminds us of the dangers that wait upon the abuse of power by officialdom unchained. The warning is so fraught with truth that it can never be untimely. But timely too is the reminder, as a host of impoverished investors will be ready to attest, that there are dangers in untruths and half truths when certificates masquerading as securities pass current in the market. There are dangers in spreading a belief that untruths and half truths, designed to be passed on for the guidance of confiding buyers, are to be ranked as peccadillos, or even perhaps as part of the amenities of business. When wrongs such as these have been committed or attempted, they must be dragged to light and pilloried. To permit an offending registrant to stifle an inquiry by precipitate retreat on the eve of his exposure is to give immunity to guilt; to encourage falsehood and evasion; to invite the cunning and unscrupulous to gamble with detection. If withdrawal without leave may check investigation before securities have been issued, it may do as much thereafter, unless indeed consistency be thrown to the winds, for by the teaching of the decision withdrawal without leave is equivalent to a stop order, with the result that forthwith there is nothing to investigate. The statute and its sanctions become the sport of clever knaves.

Appeal is vaguely made to some constitutional immunity, whether express or implied is not stated with distinctness. It cannot be an immunity from the unreasonable search or seizure of papers or effects: the books and documents of the witness are unaffected by the challenged

order. It cannot be an immunity from impertinent intrusion into matters of strictly personal concern: the intimacies of private business lose their self-regarding quality after they have been spread upon official records to induce official action. In such circumstances the relevance of *Entick* v. *Carrington*, 19 Howell's St. Trials, 1030, 1074, or *Boyd* v. *United States*, 116 U. S. 616, 629, or *In re Pacific Railway Comm'n*, 32 Fed. 241, 250, is not readily perceived. Cf. *Interstate Commerce Comm'n* v. *Brimson*, 154 U. S. 447, 469, 478. If the immunity rests upon some express provision of the Constitution, the opinion of the court does not point us to the article or section. If its source is to be found in some impalpable essence, the spirit of the Constitution or the philosophy of government favored by the Fathers, one may take leave to deny that there is anything in that philosophy or spirit whereby the signer of a statement filed with a regulatory body to induce official action is protected against inquiry into his own purpose to deceive. The argument for immunity lays hold of strange analogies. A Commission which is without coercive powers, which cannot arrest or amerce or imprison though a crime has been uncovered, or even punish for contempt, but can only inquire and report, the propriety of every question in the course of the inquiry being subject to the supervision of the ordinary courts of justice, is likened with denunciatory fervor to the Star Chamber of the Stuarts. Historians may find hyperbole in the sanguinary simile.

The Rule now assailed was wisely conceived and lawfully adopted to foil the plans of knaves intent upon obscuring or suppressing the knowledge of their knavery.

The witness was under a duty to respond to the subpoena.

Mr. Justice Brandeis and Mr. Justice Stone join in this opinion.