## POP RADIO, LP *v.* NEWS AMERICA MARKETING IN-STORE, INC.

Superior Court, Complex Litigation Docket at Stamford

File No. X08-CV05-4002814S

Memorandum filed September 15, 2005

*Murtha Cullina, LLP*, and *Sheehan Phinney Bass & Green*, pro hac vice, of the New Hampshire bar, for the plaintiff.

*Shipman & Goodwin, LLP*, for the defendant.

ADAMS, J. The plaintiff, POP Radio, LP (POP), owns and operates a business of in-store radio advertising in approximately 6000 food and drug stores in the United States. The advertising is delivered by satellite radio and played over the stores' audio systems. Typically, Muzak provided music is played for forty-six minutes an hour, and POP's audio advertising, in thirty second spots, is run for the remaining fourteen minutes each hour.

The defendant, News America Marketing In-Store, Inc. (News America), provides consumer advertising and promotional services to advertisers and marketers in almost 35,000 supermarkets, drug stores and other mass merchandisers. Its products are attached to shelves, floors, shopping carts and use coupon dispensers.

In 2003, POP purchased the assets of its business, then known as Smart Source Radio, from News America. These assets included vendor agreements, agreements with retailers and the name "Pop Radio." POP is derived from the phrase "point of purchase." No tangible assets were included in the transaction. As an integral part of the purchase and sale transaction, News America and POP each agreed to abide by the terms of a noncompetition agreement (agreement). The noncompetition agreement limiting News America stated: "For a period of ten years from the date hereof, Seller shall not directly or indirectly, and shall cause its executive officers not to own (other than the ownership of 1% or less of the outstanding capital stock of a publicly traded company), engage in, manage, operate, finance, or participate in the ownership, management, operation or financing of, or permit its name to be used in connection with, any business or enterprise engaged

in the United States in a business similar to or competitive with audio-only, in-store advertising messaging systems for commercial establishments." Additionally, the agreement contained what is known as an integration and merger clause to the effect that the agreement superseded all prior agreements and understandings.

On November 10, 2004, News America announced publicly a new advertising or marketing program known as AudioInk, developed by a company, T-Ink, Inc., using conductive ink technology allowing printed in-store advertisements to deliver audio messages activated by touching a printed advertisement. POP instituted the present action thereafter, seeking, inter alia, permanent and temporary injunctive relief on the basis of the previously quoted provision of the agreement.

The case was transferred to the complex litigation docket and, after conferring with counsel, a hearing on POP's application for temporary injunctive relief was held on three consecutive Mondays in July, so as not to conflict with the court's trial schedule.[1] A final day of testimony took place in August. Following the completion of testimony, it was learned that News America planned to introduce its AudioInk products into stores within a matter of days and, certainly, by the end of the month of August. Faced with these circumstances, the court issued a limited interim restraining order, enjoining the introduction of the AudioInk products into stores, which also carried POP's radio advertising, until the court had an opportunity to read and consider the posthearing papers submitted by the parties and to render a decision. The court takes this opportunity to observe that both parties were represented by very competent counsel who performed their representation

[1] The parties were unable to agree on consolidating the temporary injunction hearing with a full trial on the merits. A full trial on the merits is scheduled for April, 2007.

with a high degree of professional skill and advocacy, yet in a manner conducive to presenting the facts and legal arguments efficiently and effectively.

## I

## LEGAL STANDARDS FOR A TEMPORARY INJUNCTION

The parties have generally concluded that the interpretation and enforcement of the written agreement between POP and News America are governed by Delaware law because the noncompetition agreement at issue, by its terms, states that it shall be governed by the laws of that jurisdiction. The court agrees with that conclusion. See *Elgar* v. *Elgar*, 238 Conn. 839, 679 A.2d 937 (1996). The standards for granting or denying a preliminary or temporary injunction are established by the law of Connecticut. *Custard Ins. Adjusters, Inc.* v. *Nardi*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-98-0061967S (April 20, 2000) (*Corradino, J.*); *Genalco, Inc.* v. *Turcotte*, Superior Court, judicial district of New Haven, Docket No. 337838 (November 2, 1992) (*Burns, J.*); see also chapter 916, General Statutes §§ 52-471 through 52-483.

The primary purpose of a temporary injunction is to preserve the status quo and protect the moving party from immediate and irreparable harm until the merits of the case have been determined after a full trial. *Olcott* v. *Pendleton*, 128 Conn. 292, 295, 22 A.2d 633 (1941). To be entitled to the equitable relief of a temporary injunction, the moving party must show that (1) it is likely to prevail on the merits of its claim after trial; (2) it faces immediate and irreparable harm absent an injunction; and (3) the harm it faces without the injunction is greater than the harm an injunction would do to the defendants. *Griffin Hospital* v. *Commission on Hospitals & Health Care*, 196 Conn. 451, 456–58, 493

A.2d 229 (1985); see generally *Fleet National Bank* v. *Burke*, 45 Conn. Sup. 566, 570, 727 A.2d 823 (1998).

## II

## LIKELIHOOD OF SUCCESS ON THE MERITS

Under Delaware law a contract is to be interpreted to fulfill, to the extent possible, the shared expectations of the parties thereto. In a contract interpretation dispute, the court must first examine the language of the agreement to determine whether the parties' intent can be discerned from the express words used or whether the terms are ambiguous. If the terms are clear on their face, the court must apply the meaning that would be ascribed to them by a reasonable third party. If the court finds the contract terms to be ambiguous or fairly susceptible to differing interpretations, the court may consider evidence extrinsic to the contract in interpreting it to uphold the shared expectations. *Comrie* v. *Enterasys Networks, Inc.*, 837 A.2d 1, 13 (Del. Ch. 2003), aff'd, 864 A.2d 929 (Del. 2004). The Delaware Supreme Court has "held unequivocally that [e]xtrinsic evidence is not to be used to interpret contract language where that language is plain and clear on its face." (Internal quotation marks omitted.) *O'Brien* v. *Progressive Northern Ins. Co.*, 785 A.2d 281, 289 (Del. 2001).

The AudioInk products of News America presently ready for the market consist of one product to be placed on the store aisle floor and one on the shelf adjacent to or at the location of the retail product being promoted. The AudioInk floor product is a rubberized type mat, less than one eighth of an inch in thickness. Each mat can have three or four areas, which, when pressure is applied, activate a speaker placed at ear level on a nearby shelf by using radio waves and transmit an audio message up to thirty seconds in length, which can be repeated up to 8000 times with six second intervals

between activations. In the example in evidence, a product uses the cartoon character of the Pink Panther as a promotional device; the floor mat has a picture of the Pink Panther, the name of the product and three points on the mat inviting a customer to "step here." In addition, there are six separate smaller mats in the shape of paw prints leading to the larger mat. Pressure exerted by stepping on, or just running a shopping cart over, any "step here" points will activate the audio message.[2]

The AudioInk shelf product is attached to a display shelf and contains a printed advertisement or graphic within a plastic frame. At a point on the graphic where it says "press here," pressure will activate the audio message in the same fashion as the floor product. Evidence at the hearing indicated that the audio messages of the AudioInk products could be played at up to eighty-five decibels and were likely to be played at between seventy and eighty decibels.

POP and News America differ greatly as to whether the language of News America's noncompetition agreement is plain on its face or ambiguous and requiring consideration of extrinsic evidence to interpret it properly. News America strongly contends such extrinsic evidence is necessary and, without deciding the issue at that time, such evidence was admitted at the hearing as to the negotiations and various drafts that led to the final agreement.

After careful consideration, the court concludes that the relevant language of the noncompetition agreement is straightforward, unambiguous and can be interpreted to ascertain the shared expectations of the parties expressed therein without resort to additional evidence. Essentially, News America (Seller) agreed that for a period of ten years, it would not engage in any business

---

[2] It is unclear whether pressure on the paw prints will activate the message.

"similar to or competitive with audio-only, in-store advertising messaging systems for commercial establishments." The Delaware Chancery Court has found that a noncompetition agreement that prohibited an employee from engaging in a business "similar or competitive to" that of his employer to be "sweeping and unambiguous." *Delaware Express Shuttle, Inc.* v. *Older*, Del. Chancery Court, Docket No. CA 19596 (October 23, 2002).

The critical issue in the present case is whether the AudioInk products are "similar to or competitive with" POP's in-store radio advertising, which is concededly "audio-only . . . ." One may fairly debate whether the News America products are "similar to" POP's radio broadcasts because the AudioInk products contain a visual component along with the audio message, although, in this court's view, the audio portion is clearly the dominant conveyor of the advertising message. The court determines, however, that POP has a likelihood of success in proving that AudioInk products are "competitive with" the audio only in-store advertising of POP. This determination is based on the evidence presented at the hearing, which showed that the significant audio content of the News America AudioInk products is directly competitive with POP's audio product for the attention of the buying public frequenting the establishments where both parties now present advertising messages or are likely to in the future. As such, the AudioInk products will allow News America to compete with POP for those advertisers who seek to attract store customers by means of an audio message.

The dictionary definition of "competition" in the business sense means "the efforts of two or more parties acting independently to secure the business of a third party by offering the most favorable terms." Webster's Ninth New Collegiate Dictionary (Merriam-Webster, 1988); see also Webster's II New College Dictionary

(Houghton Mifflin, 1995); ("[r]ivalry between two or more businesses striving for the same customers or market"); Oxford English Dictionary (Oxford University Press, 1971) ("[r]ivalry in the market, striving for [customers] between those who have the same commodities to dispose of"). In its own words, News America pronounced the AudioInk products as being competitive with POP radio. In e-mails, News America salespersons were advised that the new AudioInk products have the "breakthrough power of sound with distinctive messages at the right time and in the right place. The selling floor where brands are sold." In promoting the AudioInk products, the first point made by News America was that they were capable of "speaking to the consumers at the critical point of decision." These statements and representations are evidence of the goal of the AudioInk products and illustrate how these advertising products are marketed to the potential advertiser. That they are competitive with POP's radio product is clear when one compares how News America promoted the same radio product before selling it. Prior to selling the business to POP, News America promoted the in-store radio business known as Smart Source Radio, as "the power of sound at the moment of decision."

Also, in entering into contracts with stores to carry the Smart Source Radio product, before selling that business to POP, News America was careful, as in its contract with Brooks Pharmacy, now assigned to POP, to insert standardized language prohibiting those stores from using any other advertising or promotional materials that obstructed in whole or in part "any of the sound of the advertising supplied by [News America]." Clearly, News America recognized the damages that could be done to its clients' in-store audio advertising by competing audio advertising in the same store.

News America was very serious about making sure the decibel level of the AudioInk products was high

enough. One of its exhibits discussed how actual products would reach eighty-five decibels, whereas earlier prototypes were less loud. There was evidence through expert testimony, which was not rebutted, that the AudioInk products would interfere with both the audibility and intelligibility of POP's in-store radio products. The POP message is delivered at a range of forty-five to sixty decibels. Ten points on the decibel scale represent a doubling of the sound level. Thus, noise rated at seventy-five decibels is twice as loud as noise at sixty-five decibels and four times as loud as fifty-five decibels of noise. Indeed, the expert, Bennett Brooks, an acoustical engineer licensed as a professional engineer in Connecticut, indicated that the interference would be accentuated by the fact that News America's audio emanated from a shelf at an elevation of approximately four feet while POP's audio usually came from speakers in or near the ceiling.

News America contends that the noncompetition agreement only precludes it from reentering the in-store radio advertising business. It points out that because the in-store radio advertising business was what it sold to POP, an objectively reasonable interpretation of the noncompetition agreement would limit its prohibition to reentering the business it just sold. Taken by itself, the argument is cogent. It fails, however, to account for the language "similar to or competitive with . . . ." The court rejects News America's interpretation because the express language of the agreement's restriction encompasses not only in-store audio only advertising, but also business similar to or competitive with in-store audio only advertising.

## III

### IRREPARABLE HARM, LACK OF ADEQUATE LEGAL REMEDY

In general, the applicant for a temporary injunction must establish that such an order is necessary to avoid

irreparable harm to the applicant. In the present case, POP relies not just on an evidentiary showing of the irreparable harm it will suffer, but also on a series of Connecticut cases holding that when a noncompetition agreement is involved, the agreement is itself a valuable business asset deserving of protection, and the law in Connecticut holds that irreparable harm necessarily results by the agreement's breach. This legal theory originally sprung from *Mattis* v. *Lally*, 138 Conn. 51, 82 A.2d 155 (1951), in which our Supreme Court considered the propriety of an injunction against the defendant who sold his barber shop to the plaintiff and simultaneously agreed that he would not engage in the barbering business for five years within a specified geographical area. The defendant subsequently set up a barber shop not more than 300 yards from his old location now owned and operated by the plaintiff. The court answered the defendant's arguments that the plaintiff did not prove irreparable damage and no adequate remedy at law by stating: "[I]rreparable harm would inevitably result from a violation of the defendant's promises." Id., 56, citing 6 Page, Contracts (2d Ed.) § 3386.

News America strongly disputes that *Mattis* is authority for abandoning the necessity of proving irreparable harm, arguing that its holding should be confined to its specific facts. This court notes that *Mattis* stated as a fact that the defendant's new shop "has the patronage of old personal customers." *Mattis* v. *Lally*, supra, 138 Conn. 53.

A number of Superior Court decisions have held that irreparable harm need not be proved in noncompetition agreement cases. See, e.g., *Group Concepts, Inc.* v. *Barberino*, Superior Court, judicial district of New Haven at Meriden, Docket No. CV-03-0286221 (April 16, 2004) (37 Conn. L. Rptr. 9) (*Tanzer, J.*); *Century 21 Access America* v. *Lisboa*, Superior Court, judicial district of Ansonia-Milford, Docket No. CV-03-081901 (July 22, 2003) (35 Conn. L. Rptr. 272) (*Ronan, J.*); *Musto* v.

*Opticare Eye Health Centers, Inc.*, Superior Court, judicial district of Waterbury, Complex Litigation Docket, Docket No. X02-CV-99-0155663 (August 9, 2000) (*Hodgson, J.*); *Sagarino v. SCI Connecticut Funeral Services, Inc.*, Superior Court, judicial district of New Britain, Docket No. CV-00-0499737 (May 22, 2000) (*Aurigemma, J.*); *Gartner Group, Inc. v. Mewes*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-91-0118332 (January 3, 1992) (7 C.S.C.R. 275) (*Mottolese, J.*).

The court cites the previous Superior Court cases not as controlling authority, of course, but because they collectively appear to develop a theme that combines the concepts of the inherent difficulties of proving harm that might not occur until the future and the need to enjoin an ongoing breach of an agreement that devalues the agreement itself and potentially the company's goodwill, both of which are business assets.

News America, as noted, contests the viability of *Mattis* as precedent for the aforementioned cases, arguing that there is no controlling appellate authority on the question. In addition, News America cites a number of Superior Court decisions requiring a showing of irreparable harm to support an injunction that is based on a breach of a noncompetition agreement. See, e.g., *Haims, Buzzeo & Co. v. Wikstrom*, Superior Court, judicial district of Stamford-Norwalk, Docket No. CV-02-0190077 (September 8, 2003) (*Hon. William B. Lewis*, judge trial referee); *Wentworth Laboratories, Inc. v. Probe 2000, Inc.*, Superior Court, judicial district of Danbury, Docket No. CV-02-0346892S (November 19, 2002) (*Fischer, J.*); *G7 Systems v. Ginthwain*, Superior Court, judicial district of Tolland, Docket No. CV-01-76334S (September 17, 2001) (*Klaczak, J.*). In *New England Eyecare of Waterbury, P.C. v. New England Eyecare, P.C.*, Superior Court, judicial district of Waterbury, Docket No. 099465 (January 18, 1991) (*Blue, J.*),

the Superior Court, finding Connecticut law on temporary injunctions "somewhat rudimentary," and utilizing the standard set by the United States Court of Appeals for the Second Circuit for issuance of a preliminary injunction (called a temporary injunction in Connecticut) requiring irreparable harm, denied a temporary injunction. The court found "not one scintilla" of evidence to support that the alleged breach of a noncompetition agreement had any impact on the plaintiff's business and appeared to opine that irreparable harm must rise to the level of ruination of a business.

After carefully reviewing the many cases cited by the parties and those turned up in its own research, the court concludes that Connecticut law supports a distinctly moderated level of proof required to establish the elements of irreparable harm and lack of an adequate remedy at law necessary for the issuance of a temporary injunction when the circumstances involve an alleged breach of a noncompetition agreement. Although this court will not go so far as to say that these two elements are automatically established; cf. *Edge Technology Services, Inc.* v. *Worley*, Superior Court, judicial district of New Haven, Docket No. CV-05-4008278 (July 5, 2005) (39 Conn. L. Rptr. 671) (*Lopez, J.*); the realities of attempting to prove irreparable harm in circumstances, such as here, when the competition has not yet, or only barely commenced, counsel toward the imposition of a more lenient standard that allows for a certain amount of informed prediction of future results to be weighed by the court as evidence than otherwise might normally be the case.

In the present case, there was evidence that POP was seeking advertising business from the same packaged goods merchandisers as News America. There was also evidence that POP's radio advertising takes place in thousands of retail stores in which News America seeks to place AudioInk products and that AudioInk products

will be placed in stores to which POP wants to sell its radio product. In addition, Brooks' testimony indicated that the AudioInk products would interfere with POP's radio broadcasts. All of this points toward a distinct potential loss of advertising customers.

In the agreement itself at paragraph three, News America acknowledged that if there were a breach of the agreement by it, POP's remedies at law would be "inadequate" and that POP would be entitled to an injunction. This acknowledgment, made by the persons most knowledgeable and informed about the business POP was buying, is, if not an admission, at least evidence and a recognition of the reality that money damages would not be sufficient to remedy the loss. See *Custard Ins. Adjusters, Inc.* v. *Nardi*, supra, Superior Court, Docket No. CV-98-0061967S.

Goodwill is the likelihood that past business will substantially continue and existing customers will continue to be customers. The preservation of a customer base is an essential goal of the buyer of an existing business. In the subject noncompetition agreement, News America acknowledged that its restrictions were "reasonable and necessary to protect the legitimate business interests of [POP and that POP] would not consummate [the purchase] in the absence of such restrictions." In *New England Eyecare of Waterbury, P.C.* v. *New England Eyecare, P.C.*, supra, Superior Court, Docket No. 099465, the court, which, as previously noted, set a very high threshold for proving irreparable harm, agreed that loss of goodwill would constitute such harm.

Given the finding that the parties' products compete, the strong suggestions that the competition could involve loss of existing customers and the acknowledgment by News America that remedies at law would be

inadequate, the court determines that POP has established sufficient evidence of irreparable harm to justify the issuance of an injunction.

## IV

## BALANCING OF EQUITIES

The court determines that the balancing of equities favors the issuance of a temporary injunction. In considering the equities, the court must weigh whether the harm likely to occur to the defendant if a temporary injunction is granted is greater or less than the harm likely to occur to the plaintiff if the injunction is denied. News America is a very large (approximately $1 billion in annual revenue) subsidiary of an even larger parent corporation, News Corp. (approximately $21 billion in annual revenue). In 2004, POP had revenues of $1.2 million. News America has estimated that if an injunction should issue and extend to the trial date of April, 2007, it would lose profits of approximately $1.4 million. This estimate was extrapolated on the basis of booked sales of AudioInk products to date and an estimated profit rate of 41 percent of total sales. The threatened harm to POP is, as noted, less precise, but if the News America products reduced POP's revenues to any significant degree, it might threaten the company's viability. The estimated loss to News America is significant; however, it does not threaten its business future.[3]

POP purchased the assets of its business from News America for $1.5 million with $250,000 down and the remainder payable by way of a promissory note payable in full in 2008 (earlier partial payments are due if POP's annual revenues exceed $3 million). For this amount, POP received contractual rights and "goodwill," but no

---

[3] The "core" businesses of News America, as described less than two years ago, were its "at shelf printed advertising, at shelf couponing, at shelf 'take one' advertising and promotion, floor advertising, cart advertising and free-standing insert advertising."

physical assets. An impairment of the goodwill would seriously impact POP's ability to pay the note.

News America points out that it has entered into contractual relations with packaged goods companies to advertise their product with AudioInk products, and, furthermore, it is actively using the product to advertise its customers' goods in stores, not POP's radio advertising. News America may well suffer some damage to its customer relations, in addition to loss of profits, if an injunction is issued prohibiting the use of AudioInk products. Nevertheless, as POP correctly points out, News America was served with the complaint in the present case in December, 2004, at least seven months before the AudioInk products were ready for use in stores. That complaint made clear that POP was seeking injunctive relief, both permanent and temporary. There is ample authority for the proposition that News America, on notice that POP sought to enjoin the marketing and use of the AudioInk products, continued to sell and place them in stores at its own risk. 42 Am. Jur. 2d, Injunctions § 3 (2000); see also *Jones* v. *Securities & Exchange Commission,* 298 U.S. 1, 17–18, 56 S. Ct. 654, 80 L. Ed. 1015 (1936); *Broadriver, Inc.* v. *Stamford,* 158 Conn. 522, 527, 265 A.2d 75 (1969) (defendants act at their peril by undertaking to do something plaintiff seeks to enjoin). Furthermore, an appropriate bond will alleviate any losses to News America if a permanent injunction is not found to be appropriate after a full trial on the merits.

V

CONCLUSION

For the reasons stated, the court concludes that a temporary injunction should issue. The injunction will restrain News America from use of the AudioInk products, no matter where situated. There was considerable and sometimes conflicting evidence presented about

the use or nonuse of other News America products prior to this lawsuit that did not use the AudioInk technology but contained an audio element that was apparently much shorter and with less fidelity. POP, somewhat halfheartedly, seeks to enjoin the use of these products. The court declines to do so, largely because there was no evidence that they caused harm to POP or that they interfered with POP's audio advertising.

Therefore, it is hereby ordered that News America and all those acting in concert with News America are enjoined from placing or installing or causing the placement or installation of any AudioInk product in any commercial establishment until further order of this court.

Pursuant to General Statutes § 52-472, POP shall post bond in the amount of $1.4 million to answer all damages if it should not prosecute the action to effect. See *Lawlor* v. *Merritt*, 81 Conn. 715, 719, 72 A. 143 (1909).