**Samuel H. SLOAN d/b/a Samuel H. Sloan & Co., Petitioner,**

v.

**SECURITIES AND EXCHANGE COMMISSION, et al., Respondents.**

**Samuel H. SLOAN, Petitioner,**

v.

**SECURITIES & EXCHANGE COMMISSION, Respondent.**

**Nos. 36, 266, Dockets 75–4087, 76–4110.**

United States Court of Appeals, Second Circuit.

Argued Oct. 13, 1976.

Decided Nov. 18, 1976.

As Amended on Denial of Rehearing Dec. 27, 1976.

**154**

Samuel H. Sloan, pro se.

David Ferber, Sol. to the Commission and Frederick B. Wade, Securities and Exchange Commission, Washington, D. C., for respondents.

Before MEDINA, ANDERSON and GURFEIN, Circuit Judges.

ROBERT P. ANDERSON, Circuit Judge:

*Case No. 75–4087*

This is the appellant Samuel H. Sloan's latest maneuver in his long struggle to avoid compliance with the Securities Exchange Act and disciplinary measures brought by the S.E.C.[1] He is now seeking a review of the order of the Commission, dated April 28, 1975, revoking the broker-dealer registration of Samuel H. Sloan d/b/a Samuel H. Sloan & Co., and barring him from associating with any broker or dealer.

He argues, *inter alia*, that his constitutional rights were violated when the SEC refused to let him withdraw his broker-dealer registration as Sloan & Co., which he attempted to do as soon as the SEC took the first steps to revoke the license. As authority for his right to do this he cites *Jones v. SEC*, 298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015 (1936). But that case dealt with the withdrawal as a matter of right, under the Securities Act of 1933, of a *registration statement* concerning *securities*. It had nothing whatever to do with a broker-dealer licensing registration.

The petitioner declares that § 15(b) of the Securities Exchange Act of 1934 is a criminal statute, which makes broker-dealers inherently suspect with respect to criminal activities. He, therefore, asserts that a statutory or regulatory provision which requires them to furnish information about activities which have been made criminal under some provision of the Act, in effect, compels them to testify against themselves. He equates his own case with *Leary v. United States*, 395 U.S. 6, 89 S.Ct. 1532, 23 L.Ed.2d 57 (1969), and *Marchetti v. United States*, 390 U.S. 39, 47, 88 S.Ct. 697, 19 L.Ed.2d 889 (1968), where respectively (a) disclosure of possession of marihuana or (b) wagering activities for tax purposes exposed the taxpayer to prosecution under state and federal laws. The argument, of course, has no bearing on the present case because the applicable statute with which the case is concerned is not criminal but clearly regulatory in nature. The Supreme Court carefully pointed up this distinction in *Albertson v. Subversive Activities Control Board*, 382 U.S. 70, 79, 86 S.Ct. 194, 15 L.Ed.2d 165 (1965).

The petitioner also complains that his Fifth Amendment right to notice and a hearing and his Sixth Amendment right to be informed of the nature of the charges against him were violated. It appears from the record that the proceedings by the SEC against Sloan were commenced on April 25,

---

1. A history of Sloan's litigation with the S.E.C. is set out in this court's opinions in *Sloan v. SEC*, 535 F.2d 676, 677 and nn. 2, 3 (2d Cir. 1976), and *SEC v. Sloan*, 535 F.2d 679, 680 (2d Cir. 1976).

1972 by mailing to Sloan a three page order for public proceedings. Petitioner does not claim that he did not receive them, and he in fact appeared through his counsel. Although he received notice, he goes on to complain that the order did not give him a sufficiently full or definite statement of the "nature and the cause of the accusations against him." An examination of the Order for Public Proceedings, however, discloses that the allegations against Sloan were made with great particularity and in detail so that he was fully apprised of the claims made against him; he knew what the nature of the charges was, against which he had to defend himself.

■■ He complains that the order was not signed or verified in accordance with Rule 11, F.R.C.P. and asserts that the S.E.C. was required to have specially pleaded allegations of fraud. But administrative proceedings are not bound to follow the Federal Rules of Civil Procedure.

Among other things the petitioner challenges the constitutionality of the Act itself, as he has done on numerous occasions in other actions. These former attacks[2] were characterized by this court as "frivolous," and we are of the opinion that the present claims are equally so.

The remaining points sought to be raised by the petitioner have no merit and call for no comment. Moreover, prior to the revocation of Sloan's license by the S.E.C., the United States District Court for the Southern District of New York had issued a preliminary injunction, which it subsequently made permanent, ordering Sloan to discontinue his violations of the S.E.C. rules relating to record keeping and net capital. This court dismissed an appeal from the granting of this injunction. *S.E.C. v. Sloan*, 538 F.2d 313 (2d Cir. 1976). Thereafter the same district court issued another preliminary injunction on January 17, 1975, prohibiting Sloan from submitting quotations of over-the-counter transactions to "the pink sheets." This court dismissed an appeal

from this preliminary injunction on January 7, 1976. *S.E.C. v. Sloan, supra.* Each of these injunctions was in itself a sufficient ground to support the revocation of Sloan's broker-dealer license under § 15(b)(5)(C) of the 1934 Act.

The orders of the S.E.C. are affirmed.

### Case No. 76–4110

In an appeal brought by the petitioner Sloan from a series of ten-day suspension orders imposed by the S.E.C. upon the stock of Canadian Javelin, Ltd. (CJL), a Canadian corporation, in which Sloan had extensive dealings (principally in selling the stock short), this court handed down a decision on October 15, 1975, *Sloan v. Securities & Exchange Commission*, 527 F.2d 11 (2 Cir. 1975), *cert. denied* 426 U.S. 935, 96 S.Ct. 2649, 49 L.Ed.2d 387 (1976), in which it stated that the questions raised were frivolous except for the petitioner's allegation that the " 'tacking' of ten-day summary suspension orders by the SEC for an indefinite period constitutes an abuse of that agency's authority and a deprivation of due process. Apparently this question has never been judicially considered and would seem not to be frivolous. . . ." 527 F.2d at 12. The pleadings in the case then on appeal concerned only the first of a series of ten-day suspension orders which ran from November 29, 1973 through January 26, 1975. At the time the appeal was actually heard, however, a second series of ten-day suspension orders was in progress which ran from April 29, 1975 through May 2, 1976. This court was of the opinion that in the absence of any record dealing with this second series of suspensions, it was not in a position to decide whether the second series was based on substantial evidence or if it constituted an abuse of discretion by the S.E.C. Another factor which this court noted was that the applicable statute had been amended on June 4, 1975 and the relevant sections are now §§ 12(j) and (k) of the 1934 Act, 15 U.S.C. §§ 78*l*(j) and (k).[3]

---

**2.** See *Sloan v. SEC*, 535 F.2d 676, 678 (2d Cir. 1976).

**3.** Sections 78*l*(j) and (k) read as follows:

The amended statute applies to that portion of the second series of ten-day suspension orders issued between June 4, 1975 and May 2, 1976.

In the course of its argument before this court on the prior appeal, the S.E.C., though it did not say that any statute or regulation required it, offered to grant petitioner Sloan "some sort of administrative hearing." The court noted that this would satisfy any possible exhaustion requirement and would at the same time fill out the record which the court found to be "insurmountably sparse." In the light of this development, the court dismissed Sloan's appeal without prejudice to his repleading after an administrative hearing before the SEC from which judicial review might be sought.

This decision was filed on October 15, 1975 and Sloan immediately petitioned the S.E.C. for the promised hearing. The Commission rejected his petition because it was not verified or properly formulated. On March 11, 1976 Sloan filed a new and verified petition to the Commission, demanding the hearing and requesting a declaration that the successive orders of suspension were illegal, that they violated his due process rights and the Securities Exchange Act. The decision of the Commission rejecting Sloan's petition and refusing to give him the above mentioned administrative hearing was handed down on April 21, 1976, long after the effective date of the amended statute and while the second series of ten-

day suspension orders was still being issued. Thereafter on April 23, 1976 and during the time the April 21, 1976 suspension order was operating, Sloan brought the present appeal pursuant to § 25(a)(1) of the 1934 Act, 15 U.S.C. § 78y(a)(1) (as amended, 1975), for review of this second series of suspension orders. He alleges (1) that there was no rational basis for the trading suspensions and the orders were not supported by substantial evidence; (2) that the suspension orders violated his due process rights because at no time has he been afforded notice and an opportunity for a hearing; (3) that the successive summary suspension orders, the "tacking" of ten-day orders, are unlawful because the statute specifically authorizes summary suspension of trading only "for a period not exceeding ten days"; (4) that § 78*l*(k) is an unconstitutional delegation of Congress' legislative power because a suspension of trading in a security is "legislation"; and (5) that the present proceeding is not moot even though there are no suspension orders now in effect.

With respect to the first of these claims, an examination of the record discloses there was sufficient evidence of probable manipulation of CJL's common stock and of the false and fraudulent representations as to its soundness and value to justify the Commission's conclusion that the public interest and the protection of investors required it summarily to suspend trading "for a period not exceeding ten days" in accord-

"(j) The Commission is authorized by order, as it deems necessary or appropriate for the protection of investors to deny, to suspend the effective date of, to suspend for a period not exceeding twelve months, or to revoke the registration of a security, if the Commission finds, on the record after notice and opportunity for hearing, that the issuer of such security has failed to comply with any provision of this chapter or the rules and regulations thereunder. No member of a national securities exchange, broker, or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security the registration of which has been and is suspended or revoked pursuant to the preceding sentence.

(k) If in its opinion the public interest and the protection of investors so require, the Commission is authorized summarily to suspend trading in any security (other than an exempted security) for a period not exceeding ten days, or with the approval of the President, summarily to suspend all trading on any national securities exchange or otherwise, in securities other than exempted securities, for a period not exceeding ninety days. No member of a national securities exchange, broker, or dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce the purchase or sale of, any security in which trading is so suspended."

ance with both the previous sections, 19(a)(4) and 15(c)(5), as well as the new section 12(k), and the Commission, therefore, suspended trading of the stock for ten days commencing April 29, 1975.

■ At the end of this first ten-day suspension period, the Commission decided that under the circumstances the suspension order should be continued for an additional ten days. It asserts that it did this on the basis of an independent determination made at the time that continued suspension was required in the public interest and for the protection of investors. At the end of the second ten-day suspension period, it made a like determination and ordered a further ten-day suspension and then made another determination and order and another and another until the total suspension periods covered a span of 370 days or 37 ten-day suspension periods. In spite of the wording of the statute, both before and after the amendment of 1975, which authorized suspension "for a period not exceeding ten days," the Commission made its own interpretation of the statute through which it claimed to have the power to order any number of ten-day suspension periods which could total many months or even years. It relies in some measure upon legislative history which concerned the earlier act, i. e., Securities Exchange Act of 1934, § 15(c)(5) and § 19(a)(4), 15 U.S.C. § 78o(c)(5) and § 78s(a)(4), to support the legality of such tacking of ten-day orders. Although a few comments by individual senators and congressmen indicated that they were aware that the S.E.C. was using successive ten-day suspension orders for periods of extended duration, no express statutory authority for this procedure was ever enacted. The Commission further claims that the practice of roll-over ten-day suspension orders, which developed before the 1975 amendment, was carried over to the newly amended law of June 4, 1975, because Senate Report No. 94–75, 94th Cong., 1st Sess. (1975), p. 106, U.S.Code Cong. & Admin.News 1975, pp. 179, 284, stated that the proposed § 12(k) "would consolidate in one place the power

the SEC presently has to . . ." issue summary trading suspension orders. We disagree, however, with the Commission's rather free interpretation of the statute and its claims as to the legislative intent.

Section 12(k) of the 1975 amended statute, was a consolidation of the prior sections 15(c)(5) and 19(a)(4). It authorized the SEC to issue summary suspension orders, but it did not empower the Commission to adopt the arbitrary practice of issuing a string of successive ten-day suspension orders such as those promulgated in the present case. More revealing of congressional intent is the paragraph concerning subsection (j) in Senate Report No. 94–75, *supra*, at 106, U.S.Code Cong. & Admin. News, pp. 283, 284, which recites the authority the SEC has "to suspend for a period not exceeding twelve months [n. b. not a summary suspension] . . . after notice and opportunity for hearing . . ." if the Commission finds

> "that the issuer of such security has failed to comply with any provision of the Exchange Act or the rules and regulations thereunder. It would also make unlawful any trading in any such security by any broker or dealer. *With this change, the Commission is expected to use this section rather than its ten-day suspension power in cases of extended duration.*" (Emphasis added.)

This discussion immediately preceded the summary suspension power granted the Commission in subsection (k) and must be read in conjunction with it in determining congressional intent. It was clearly a part of the congressional scheme that the power to order ten-day suspensions was not to be used in cases of extended duration, such as in the present case where the suspensions ran on for more than a year.

The petitioner also claims that his constitutional rights were violated by the series of suspension orders because he was never afforded notice and an opportunity for a hearing. It is not necessary to deal with this point as a constitutional violation, however, because the procedures adopted by the

SEC plainly transgressed the statutory provisions. For a single ten-day suspension no prior notice or hearing is required because the proceeding is summary in nature and because the emergency aspect of the order, issued to protect the public interest and give protection to investors, makes it necessary.

The only remaining point advanced by the petitioner on appeal, which requires some comment, is the issue of mootness raised by the SEC, which asserts that since May 2, 1976, there has been no ten-day suspension order as to trading of CJL stock, that there are no plans on the part of the SEC to consider or to issue one and no real likelihood that one will be issued in the foreseeable future.

The petitioner claims that he has suffered great loss and damage because the suspension orders frustrated his trade in CJL stock, including short sales, and that each succeeding ten-day suspension expired before he could seek a legal review of the validity of the order.[4] Because of the SEC's continuing policy of roll-over ten-day suspension orders, the harm to him was "capable of repetition yet evading review." *Southern Pacific Terminal Co. v. ICC*, 219 U.S. 498, 31 S.Ct. 279, 55 L.Ed. 310 (1911); *Sosna v. Iowa*, 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). See also *Weinstein v. Bradford*, 423 U.S. 147, 96 S.Ct. 347, 46 L.Ed.2d 18 (1975).

This petition for review was filed before the expiration of the last ten-day suspension of the second series now before us for consideration. Moreover the petitioner had raised the question before this court in connection with its October 15, 1975 decision and again before the SEC in connection with the present case. We declare that the successive roll-over ten-day suspension procedure erroneously adopted by the SEC was improperly pursued and was contrary to the statutory provisions for summary suspensions in force April 30, 1975 to May 2, 1976. The issue of statutory construction and interpretation never became moot and has been ruled upon in this review. The SEC is, therefore, directed to discontinue forthwith its adoption and use of successive ten-day suspension orders to order the suspension of trading in a security for an extended period, i. e. in excess of ten days.

It is so ordered.

4. This court in its October 15, 1975 decision in Sloan's prior case found that the petitioner had standing, as one aggrieved. At the time he filed his petition in that case he was a trader-dealer doing business under the name of Samuel H. Sloan & Co. He dealt in several different corporate stocks, including the common stock of Canadian Javelin, Ltd., a Canadian corporation. As an individual he owned thirteen shares of Javelin common stock. On April 28, 1975 the S.E.C. revoked his registration and license, so that for the remainder of the time within which this case is concerned, Sloan was not licensed to trade.

We are of the opinion that his private ownership of the common shares is sufficient to confer standing on the petitioner to ask for a review in this case under 15 U.S.C. § 78(y) within 60 days of the S.E.C.'s promulgation of its order. *Medical Committee for Human Rights v. S.E.C.*, 139 U.S.App.D.C. 226, 432 F.2d 659, 667 (1970). The effect of the suspension order on Sloan, an existing shareholder, is equivalent to an injunction preventing him from selling his shares. He, therefore, has standing. We do not pass on whether individual shareholders have standing in other types of SEC proceedings.